THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By GEORGE W. BREWSTER JR., Chief Deputy (State Bar No. 123684)
By RONALD LENERT, Senior Deputy (State Bar No. 277434)
By MORRIS G. HILL, Senior Deputy  (State Bar No. 97621)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-4893; (619) 531-5805; (619) 531-5510
Fax: (619) 531-6005
E-mail: george.brewster@sdcounty.ca.gov;
E-mail: ronald.lenert@sdcounty.ca.gov
E-mail: morris.hill@sdcounty.ca.gov

JAMES F. HOLTZ, Esq.  (State Bar No. 95064)
Law Offices of James F. Holtz, APC
2488 Historic Decatur Road, Suite 200
San Diego, California 92106
Telephone: (619) 881-1246; Fax: (619) 924-5199
E-mail: james.holtz@holtzapc.com

MILDRED K. O'LINN, Esq.  (State Bar No. 159055)
AL M. DE LA CRUZ, Esq.  (State Bar No. 151388)
Manning & Kass
Ellrod, Ramirez, Trester LLP
550 West C Street, Suite 1900
San Diego, California 92101
Telephone: (619) 515-0269; Fax: (619) 515-0268
E-mail: mko@manningllp.com; amd@manningllp.com

Attorneys for Defendants County of San Diego and Jeremy Banks

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICKAIL MYLES, an individual, | No. 15-cv-1985-BEN(BLM) |
| Plaintiff, | Date: December 12, 2016 |
| v. | Time: 10:30 a.m. |
| | Dept.: 5A - Courtroom of the Honorable Roger T. Benitez |
| COUNTY OF SAN DIEGO, by and through the SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, a public entity; and DEPUTY J. BANKS, an individual, | Trial Date:  None |
| Defendants. | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT**

_____

# TOPICAL INDEX

**Page**

TABLE OF AUTHORITIES ...................................................................................-iii-

I       INTRODUCTION ........................................................................2

II      FACTS ........................................................................................2

III    STANDARD FOR SUMMARY JUDGMENT ..........................................11

       A.  Generally ..........................................................................11

       B.  Qualified Immunity ...............................................................11

IV    APPLICABLE LEGAL PRINCIPLES ...................................................13

       A.  California Law Causes Of Action ...........................................13

            1.  Unlawful Physical Force -- California Law .......................14

            2.  Unlawful Detention -- California Law .............................15

       B.  Federal Claims ....................................................................16

            1.  Unlawful Physical Force -- Federal Law ..........................16

            2.  Unlawful Detention -- Federal Law ................................18

            3.  Entity Liability -- Federal Law ......................................19

       C.  Limitations On Expert Opinions .............................................22

V      ARGUMENT ...........................................................................23

       A.  Deputy Banks' Use Of Force Was Lawful And
            Objectively Reasonable ........................................................23

# TOPICAL INDEX
## (Cont'd.)

**Page**

B.  Myles' Detention, Though Not Initiated By
Deputy Banks, Was Justified By Reasonable Suspicion .......................24

C.  Alternatively, The County Of San Diego Is Not Liable
Under Federal Law ..................................................................24

D.  Alternatively, Deputy Banks Is Entitled To Qualified
Immunity From Liability Under Federal Law .......................................25

VI    CONCLUSION ...........................................................................26

# TABLE OF AUTHORITIES

**Page**

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir.2002) ..............23

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ...........................11

Ashcroft v. al-Kidd, 131 S. Ct. 2074 (2011) ....................................12, 13

Bender v. County of Los Angeles, 217 Cal.App.4th 968 (2013) ...........................15

Board of County Commissioners of Bryan County, Oklahoma v. Brown,
 520 U.S. 397 (1997) ...................................................................20, 21, 24

Brown v. Ransweiler, 171 Cal.App.4th 516 (2009) ...............................14

Cabesuela v. Browning-Ferris Industries, (1998) 68 Cal.App.4th 101
 (1998) .................................................................................15

Camreta v. Greene, 563 U.S. 692 (2011) ..................................................13

Celotex Corp v. Catrett, 477 U.S. 317 (1986) .......................................11

Cervantez v. J.C. Penney Co., 24 Cal.3d 579 (1979) ..............................15

City & County of San Francisco v. Sheehan, 135 S. Ct. 1765 (2015) ..................12

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) ...........................19, 20, 21, 24

City of Los Angeles v. Heller, 475 U.S. 796 (1986) ...............................19

Collins v. City and County of San Francisco, 50 Cal.App.3d 671 (1975) .............15

Conner v. Heiman, 672 F.3d 1126 (2012) .............................................13

Connick v. Thompson, 563 U.S. 51 (2011) ....................................................20, 22

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) ..................................22

# TABLE OF AUTHORITIES
## (Cont'd.)

**Page**

Espinosa v. City & Cnty. of San Francisco, 598 F.3d 528 (9th Cir. 2010) ......17, 25

Evans v. City of Bakersfield, 22 Cal.App.4th 321 (1994) ...............................14, 16

Farmer v. Brennan, 511 U.S. 825 (1994) ................................................................21

Forrester v. City of San Diego, 25 F.3d 804 (9th Cir.1994) ...................................18

Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957 (9th Cir 1994) ..........................11

Glenn v. Washington Cty., 673 F.3d 864 (9th Cir.2011) .......................................23

Graham v. Connor, 490 U.S. 386 (1989) ....................................................16, 17, 18

Griffin v. Breckenridge, 403 U.S. 88 (1971) .........................................................17

Haley v. Dormire, 845 F.2d 1488 (8th Cir. 1988) .................................................17

Hamilton v. City of San Diego, 217 Cal.App.3d 838 (1990) ................................15

Hayes v. County of San Diego, 57 Cal.4th 622 (2013) .........................................14

Hunter v. Bryant, 502 U.S. 224 (1991) ..................................................................13

Illinois v. Wardlow, 528 U.S. 119 (2000) ..............................................................18

In re Tony C., 21 Cal.3d 888 (1978) ......................................................................16

Lake Nacimiento Ranch Co. v. San Luis Obispo, 841 F.2d 872
  (9th Cir. 1987) ....................................................................................................11

Levin v. United Air Lines, Inc., 158 Cal.App.4th 1002 (2008) ............................15

Lowry v. City of San Diego, 818 F.3d 840 (9th Cir. 2016) ..................................23

Lugar v. Edmondson, 457 U.S. 922 (1982) ...........................................................16

# TABLE OF AUTHORITIES
## (Cont'd.)

**Page**

Lyall v. City of Los Angeles, 807 F.3d 1178 (2015) ...............................................19

Malley v. Briggs, 475 U.S. 335 (1986) ..................................................................25

Mullenix v. Luna, 136 S. Ct. 305 (2015) ...............................................................12

Monell v. Department of Social Services, 436 U.S. 658 (1978) ...............19, 20, 21

Pearson v. Callahan, 555 U.S. 223 (2009) ............................................................12

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) ......................................19, 20

People v. Souza, 9 Cal.4th 224 (1994) ...................................................................16

People v. Yuen, 32 Cal. App. 2d 151 (1939) ..........................................................14

Plotnik v. Meihaus, 208 Cal. App. 4th 1590 (2012) ..............................................14

Reynolds v. Cty. of San Diego, 84 F.3d 1162 (9th Cir. 1996) ...............................22

Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154 (9th Cir.2014) .........23

Saucier v. Katz, 533 U.S. 194 (2001) ....................................................................18

Taylor v. Barkes, 135 S. Ct. 2042 (2015) ........................................................11, 12

Terry v. Ohio, 392 U.S. 1 (1968) ...........................................................................18

Torres v. City of Los Angeles, 548 F.3d 1197 (9th Cir. 2008) ........................12, 13

Torres v. City of Madera, 648 F.3d 1110 (9th Cir.2011) .......................................17

Trerice v. Pedersen, 769 F.2d 1398 (9th Cir.1985) ...............................................17

Trevino v. Gates, 99 F.3d 911 (9th Cir.1996)........................................................22

# TABLE OF AUTHORITIES
## (Cont'd.)

**Page**

United States v. Valdes-Vega, 738 F.3d 1074 (9th Cir. 2013) ...............................18

Velazquez v. City of Long Beach, 793 F.3d 1010 (9th Cir. 2015) ........................18

Washington v. Lambert, 98 F.3d 1181 (9th Cir. 1996) ..........................................19

## STATUTES

Civil Code
   Section 51.7 ...............................................................................13, 15
   Section 52.1 ...............................................................................13, 15

Federal Rules of Civil Procedure
   Rule 56 ............................................................................................11

Federal Rules of Evidence
   Rule 702(c) .....................................................................................22

Penal Code
   Section 148(a)(1) ...........................................................................10

42 United States Code
   Section 1983 ..................................................................11, 16, 19, 20
   Section 1985 ........................................................................16, 17
   Section 1986 ........................................................................16, 17

1  THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
   County of San Diego
2  By GEORGE W. BREWSTER JR., Chief Deputy (State Bar No. 123684)
   By RONALD LENERT, Senior Deputy (State Bar No. 277434)
3  By MORRIS G. HILL, Senior Deputy  (State Bar No. 97621)
   1600 Pacific Highway, Room 355
4  San Diego, California 92101-2469
   Telephone: (619) 531-4893; (619) 531-5805; (619) 531-5510
5  Fax: (619) 531-6005
   E-mail: george.brewster@sdcounty.ca.gov;
6  E-mail: ronald.lenert@sdcounty.ca.gov
   E-mail: morris.hill@sdcounty.ca.gov
7
   JAMES F. HOLTZ, Esq.  (State Bar No. 95064)
8  Law Offices of James F. Holtz, APC
   2488 Historic Decatur Road, Suite 200
9  San Diego, California 92106
   Telephone: (619) 881-1246; Fax: (619) 924-5199
10 E-mail: james.holtz@holtzapc.com

11 MILDRED K. O'LINN, Esq.  (State Bar No. 159055)
   AL M. DE LA CRUZ, Esq.  (State Bar No. 151388)
12 Manning & Kass
   Ellrod, Ramirez, Trester LLP
13 550 West C Street, Suite 1900
   San Diego, California 92101
14 Telephone: (619) 515-0269; Fax: (619) 515-0268
   E-mail: mko@manningllp.com; amd@manningllp.com
15
   Attorneys for Defendants County of San Diego and Jeremy Banks
16

17            **IN THE UNITED STATES DISTRICT COURT**

18          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

19

| | | |
|---|---|---|
| 20 | MICKAIL MYLES, an individual, ) | No. 15-cv-1985-BEN(BLM) |
| 21 | Plaintiff, ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF |
| 22 | v. ) | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR |
| 23 | COUNTY OF SAN DIEGO, by and ) through the SAN DIEGO COUNTY ) | ALTERNATIVELY PARTIAL SUMMARY JUDGMENT |
| 24 | SHERIFF'S DEPARTMENT, a public ) entity; and DEPUTY J. BANKS, an ) | Date: December 12, 2016 |
| 25 | individual, ) | Time: 10:30 a.m. |
| 26 | Defendants. ) | Dept.: 5A - Courtroom of the Honorable Roger T. Benitez |
| 27 | | Trial Date:  None |
| 28 | /// | |

# I

## INTRODUCTION

Sheriff's Deputy Jeremy Banks and his employer, the County of San Diego, respectfully move for summary judgment on grounds that that they did not violate any of plaintiff Mickail Myles' federally-protected rights, or violate California law.  Defendants alternatively seek partial summary judgment on force and detention claims, partial summary judgment that the County of San Diego is not liable under federal law, and partial summary judgment that defendant Deputy Banks is protected from liability by qualified immunity.  By separate concurrent motion, defendants alternatively seek bifurcation and separate trials of County federal liability, and of punitive damages against Deputy Banks.

# II

## FACTS

A separate statement of material facts that are not genuinely disputed accompanies this motion.  The following facts relate to the underlying incident.  At about fifteen minutes before midnight on September 5, 2014, Fallbrook resident Charles Sommer phoned 911 and reported that four young men had been "trying to -- looks like break into a vehicle" located "probably 150-200 yards from my house."  Two of them "took off in a -- it looks like a white sedan.  They're probably heading around the neighborhood right now."  (Declaration of Hanan Harb, ¶ 1; Exhibit A - CD Recording and Reporter's Transcript of Audio-Recorded 911 Call by Charles Sommer on September 5, 2014, 2:12-18; (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000008.)  A Sheriff's radio dispatcher made the following broadcast:  "There were two subjects that were running and got into a white sedan, unknown DOT[1] out of the neighborhood."  (Declaration of Hanan Harb, ¶ 2; Exhibit C - CD Recording and Reporter's Transcript of Audio-Recorded Radio Dispatch Event E1930789, 3:21-22.)

///

---
[1] Direction of travel.

1    Law enforcement officers are trained to consider a suspected vehicle burglary to be a

2    potential felony.  (Exhibit D - Expert Witness Declaration of Curtis J. Cope, page 7.)

3          Defendant Sheriff's Deputy Jeremy Banks (and other deputies) responded to the

4    radio call.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy

5    Banks, CSD-000009.)  At the suspected vehicle burglary scene, a white sedan drove past,

6    and bystanders yelled "that's the car, that's the car."  (Declaration of Jeremy Banks, ¶¶ 1,

7    2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.)  The white sedan that

8    drove past was occupied by two young men, later identified as plaintiff Mickail Myles

9    (driver) and his brother Elisic Sauls (passenger).  (Declaration of Jeremy Banks, ¶¶ 1, 2;

10   Exhibit B - Arrest Report by Jeremy Banks, CSD-000010-000011.)  Deputies had

11   reasonable suspicion to stop the white sedan and detain its occupants.  (Exhibit D -

12   Expert Witness Declaration of Curtis J. Cope, p. 7.)  Law enforcement officers are trained

13   that reasonable force and/or physical restraints may permissibly be used to compel

14   persons to remain at the detention site.  (Exhibit D - Expert Witness Declaration of Curtis

15   J. Cope, page 7.)

16         Plaintiff's own retained police expert Jeffrey J. Noble agreed that the stop and

17   detention comported with accepted law enforcement practices.  Noble testified that:

18   • Stopping the white sedan, and detaining its occupants Myles and Sauls, was

19      consistent with generally-accepted police practices.  (Exhibit F - Deposition of

20      Jeffrey J. Noble, 29:10-15.)

21   • Use of high-risk tactics for stopping the white sedan was consistent with generally-

22      accepted police practices.  (Exhibit F - Deposition of Jeffrey J. Noble, 29:21-30:6.)

23   • Hypothetically, if the sole reason for stopping Myles and Sauls had been because

24      they were African-Americans driving in a white neighborhood, that would not

25      have been correct police practice.  (Exhibit F - Deposition of Jeffrey J. Noble,

26      30:7-13.)

27   • It was correct police tactics to order Myles and Sauls to walk backwards from the

28      car.  (Exhibit F - Deposition of Jeffrey J. Noble, 33:4-25.)

- It was proper for deputies to order Myles and Sauls to drop to their knees. (Exhibit F - Deposition of Jeffrey J. Noble, 34:13-20.)

- Having Myles and Sauls drop to their knees made it less likely they would be able to attack deputies. (Exhibit F - Deposition of Jeffrey J. Noble, 34:21-35:5.)

- Hypothetically, it would also have been proper for deputies to have ordered Myles to prone out on the ground. (Exhibit F - Deposition of Jeffrey J. Noble, 35:14-22.)

- It was correct police tactics to handcuff detainees behind their backs once officers had them in a position of disadvantage. (Exhibit F - Deposition of Jeffrey J. Noble, 35:23-36:23.)

- There is no evidence that Myles was stopped due to his race, or that Myles was racially profiled. (Exhibit F - Deposition of Jeffrey J. Noble, 39:20-40:4.)

- There is no evidence that force was used on Myles due to his race, or because Myles was racially profiled. (Exhibit F - Deposition of Jeffrey J. Noble, 39:20-40:4.)

- Myles was able to hear and comply with deputy commands to get out of the car, to put his hands up, and to walk backwards. (Exhibit F - Deposition of Jeffrey J. Noble, 43:10-21.)

Plaintiff's Complaint alleges that Myles:

> … was unlawfully profiled, stopped, detained, hand-cuffed, assaulted, battered, beaten, bitten, berated, defamed, falsely arrested, falsely imprisoned, cited and threatened to be charged with crimes he did not commit, by armed, uniformed, on-duty law enforcement officers, solely because he was a black man driving his own car to his family home in a predominately white neighborhood in Fallbrook, California.

(Complaint [ECF 1], 1:3-8.) Thus plaintiff's police expert witness Noble contradicted plaintiff's theory that he was forcefully detained solely because he was a black man driving in a predominately white neighborhood.

When Banks arrived at the stop and detention scene, Deputy Allison was behind the open driver's door of his patrol car; non-parties Deputies Brumfield and Bushnell were behind the open passenger door of Deputy Allison's patrol car, and the occupants of

- 4 -

the white sedan were still inside that car.  (Exhibit G - Deposition of Jeremy Banks, 193:18-194:15.)  The white sedan's rear window was tinted, and Deputy Banks could not see how many persons were in the car, or whether they were armed.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.)   In addition to the tinted rear window, the two rear side windows were also tinted.  (Exhibit H - Deposition of Mickail Myles, 52:11-54:13.)

Deputy Allison ordered the white sedan's driver to step out.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.) Deputy Allison directed Myles to face away from deputies, and Myles yelled "I can't hear what you are saying."  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.)  Deputy Banks was a canine officer and held his "K-9 partner" (police dog) on a six-inch metal and leather lead.  (Exhibit G - Deposition of Jeremy Banks, 236:19-23.)  Banks gave Myles a canine warning: "Follow my orders or you will be bit by the dog."  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.)   When a K-9 is involved, the K-9 deputy gives commands, in order not to break the dog's focus on the suspect in front.  (Exhibit G - Deposition of Jeremy Banks, 220:13-221:13.)

The white sedan's driver (later identified as Mickail Myles) eventually walked backwards towards deputies to the trunk area of Deputy Allison's patrol car. (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B -Arrest Report by Jeremy Banks, CSD-000010.)  The radio dispatcher had broadcast to deputies that "two subjects" … got into a white sedan …."  (Declaration of Hanan Harb, ¶ 2; Exhibit C - CD Recording and Reporter's Transcript of Audio-Recorded Radio Dispatch Event E1930789, 3:21-22.) Deputy Banks believed that at least one unknown person remained in the white sedan; he did not know whether Myles -- or the unknown person still in the car -- had a weapon; he suspected that the occupants of the white sedan had been burglarizing a vehicle, and he knew that vehicle burglars use tools that can also be used as unconventional weapons. (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-

- 5 -

000010.)  Based on the description given in the radio dispatch, Deputy Banks believed
the stopped white sedan was the one involved in the reported vehicle burglary.  (Exhibit
G - Deposition of Jeremy Banks, 279:5-9.)   Deputies Allison and Banks both
commanded Myles to drop to his knees.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B
- Arrest Report by Jeremy Banks, CSD-000010; Exhibit G - Deposition of Jeremy Banks,
223:15-224:3.)   Deputy Banks gave that order in a loud voice from a close distance, and
believes Myles heard him.  (Declaration of Jeremy Banks, ¶ 6.)  Myles did not go to his
knees.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy
Banks, CSD-000010; Exhibit G - Deposition of Jeremy Banks, 224:9-12.)

     Deputy Banks believed from Myles' actions that he would not follow clear and
concise commands being given to him.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B
- Arrest Report by Jeremy Banks, CSD-000010.)  Myles also continued to walk
backwards.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy
Banks, CSD-000010; Exhibit G - Deposition of Jeremy Banks, 229:24-230:4.)  Deputy
Banks ordered Myles to stop walking backwards, and Myles did not stop walking
backwards. (Exhibit G - Deposition of Jeremy Banks, 229:24-230:10.)   Myles had
walked about 20 to 30 feet closer to Deputy Banks by the time Banks asked Myles to
drop to his knees.  (Exhibit G - Deposition of Jeremy Banks, 284:21-28.)  Deputy Banks
had his right (dominant) hand free, and was controlling his K-9 with his left hand.
(Exhibit G - Deposition of Jeremy Banks, 230:20-231:4.)  The K-9 was barking.  (Exhibit
G - Deposition of Jeremy Banks, 234:1-5.)

     When Myles kept walking backwards and did not drop to his knees as directed,
Deputy Banks decided to act quickly to reduce the risk of injury to himself and others.
(Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-
000010.)  Deputy Banks grabbed Myles by the back of his neck, planning to push him to
his knees for handcuffing.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest
Report by Jeremy Banks, CSD-000010.)   Myles ducked his head down and escaped
Deputy Banks' grasp.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B -Arrest Report

by Jeremy Banks, CSD-000011.)  Myles then walked behind Deputy Banks, out of his view.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  Deputy Banks feared that Myles was going to attack and injure him from behind.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  To prevent such an attack, Deputy Banks turned to his right, and gave his K-9 the apprehension command.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  The apprehension command is a command to bite.  (Exhibit G - Deposition of Jeremy Banks, 240:6-20.)  With that command, the dog was trained to bite anywhere except the head, neck, and groin. (Exhibit G - Deposition of Jeremy Banks, 240:21-241:4.)  The dog bit Myles as commanded, on the left side of Myles' torso, then released his bite and bit Myles' shirt twice.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011; Exhibit G - Deposition of Jeremy Banks, 240:21-242:2.)  Deputy Banks held the K-9 on his lead throughout his entire interaction with Myles.  (Declaration of Jeremy Banks, ¶ 5.)

Deputy Allison then grabbed Myles' left arm and Deputy Brumfield grabbed Myles' right arm, and they pushed Myles against the trunk of Allison's patrol car. (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  Myles resisted and struggled against them.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  Meanwhile Deputy Bushnell was covering the white sedan with his gun.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  Deputy Banks feared that a prolonged struggle with Myles would give anyone in the white sedan an opportunity to escape or access a weapon, and that if Myles escaped from Deputies Allison and Brumfield, he could have accessed a weapon that might have been concealed on his person.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000010.)  Deputy Banks struck Myles twice in the face with his right fist while ordering him to stop resisting.  (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B -

1  Arrest Report by Jeremy Banks, CSD-000011.)   The strikes hit Myles on the left side of

2  his face.  (Exhibit G - Deposition of Jeremy Banks, 259:4-9.)  After the strikes to Myles'

3  face, he immediately stopped resisting and was handcuffed.  (Declaration of Jeremy

4  Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000011.)  Deputy

5  Banks did not strike Myles again, nor did the K-9 bite Myles again, after Myles was

6  handcuffed.  (Declaration of Jeremy Banks, ¶ 7; Exhibit G - Deposition of Jeremy Banks,

7  243:5-16.)  Deputy Banks did not punch or use other physical force on Myles after he

8  was handcuffed.  (Declaration of Jeremy Banks, ¶ 8.)

9        The dispatcher broadcast: "Driver detained, working on the passenger."

10 (Declaration of Hanan Harb, ¶ 2; Exhibit C - CD Recording and Reporter's Transcript of

11 Audio-Recorded Radio Dispatch Event E1930789, 10:18-19.)  Deputy Banks gave the

12 same instructions to the second person in the white sedan (Sauls) that had been given to

13 Myles -- exit the vehicle through the driver's door, face away with his hands in the air

14 while walking backwards to the sound of the deputy's voice, then get on his knees.

15 (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-

16 000011.)  Sauls complied with all instructions, and was handcuffed without incident.

17 (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-

18 000011.)

19        A bystander from the scene of the suspected vehicle burglary, Steven Vanni, was

20 driven to the detention scene for a curbside lineup.  (Declaration of Jeremy Banks, ¶¶ 1,

21 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000012.)  Vanni said that Myles and

22 Sauls did not match the vehicle burglary suspects.  (Declaration of Jeremy Banks, ¶¶ 1, 2;

23 Exhibit B - Arrest Report by Jeremy Banks, CSD-000012.)   Sauls was told he was not

24 under arrest; his verbal statement was taken.  (Declaration of Jeremy Banks, ¶¶ 1, 2;

25 Exhibit B - Arrest Report by Jeremy Banks, CSD-000012.)  Medics at the scene assessed

26 Myles, but did not transport him in their ambulance.  (Exhibit G - Deposition of Jeremy

27 Banks, 260:25-261:4.)  Deputy Banks drove Myles to Fallbrook Hospital for medical

28 ///

examination because he had used force on Myles.  (Exhibit G - Deposition of Jeremy Banks, 261:5-8.)

At Fallbrook hospital, Deputy Banks conducted an audio-recorded interview of Myles after reading him a *Miranda* admonishment and securing Myles' agreement to talk.  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording and Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 2:4-22.)  Banks asked "Could you clearly hear our commands?"  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording and Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 3:22.)  Myles answered "yes and no" and stated that he heard "step back," "put your hands up,"  "open your door," and that when he got closer to deputies, he heard Banks tell him "to get on your knees."  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 3:23-4:4.)  Banks asked Myles if there was any reason he chose not to, and Myles said "No reason.  I was probably just scared."  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 4:2-8.)  Banks asked Myles "did you understand that we were deputy sheriffs, law enforcement officers?"  Myles answered "Yeah."  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 4:9-12.)  Banks asked Myles if he understood "that this could have went a little bit smoother if you would have followed everything we told you to do?"  Myles answered "I've never been here before.  So I'm pretty sure yeah, but I've never been here before."  (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 4:25:5:4.)  Banks asked Myles if he had heard his "announcements

that you were going to be bit if you didn't do as I told you?" Myles responded noncommittally: "Sir, it was -- it was kind of a blur, so …" (Declaration of Jeremy Banks, ¶¶ 3, 4; Exhibit I - CD Recording Reporter's Transcript of Audio-Recorded Interview of Mickail Myles by Jeremy Banks at Fallbrook Hospital Dated September 6, 2014, 4:5-22-25.)

While Myles was still at Fallbrook Hospital, Sergeant Brian Hout of the Sheriff's Canine Unit arrived and conducted another audio-recorded interview. (Exhibit J - CD Recording and Reporter's Transcript of Recording of Interview of Mickail Myles by Sergeant Brian Hout on September 6, 2014, 2:9-16.) Sergeant Hout asked Myles if he heard a warning that the dog would be sent. Myles responded noncommittally: "Sir, it was all a blur." (Exhibit J - CD Recording and Reporter's Transcript of Recording of Interview of Mickail Myles by Sergeant Brian Hout on September 6, 2014, 3:9-13.) Myles then said "I mean, I can add to that. I mean, you know, they told me to get out of the car, back up. And there was a lot of them at once, you know, yelling or whatever. I saw the dog, but I don't know." (Exhibit J - CD Recording and Reporter's Transcript of Recording of Interview of Mickail Myles by Sergeant Brian Hout on September 6, 2014, 3:15-18.) Sergeant Hout asked how long the dog was biting him, and Myles answered "Not long. Probably a couple seconds, I guess." (Exhibit J - CD Recording and Reporter's Transcript of Recording of Interview of Mickail Myles by Sergeant Brian Hout on September 6, 2014, 3:24-4:2.) Sergeant Hout asked Myles how the dog got off him, and Myles responded "I'm guessing they pulled him off." (Exhibit J - CD Recording and Reporter's Transcript of Recording of Interview of Mickail Myles by Sergeant Brian Hout on September 6, 2014, 4:3-5.)

After interviewing Myles, Deputy Banks cited him for violation of Penal Code § 148(a)(1), obstructing a peace officer, and released him at the hospital at about 2:00 a.m. on September 6, 2014. (Declaration of Jeremy Banks, ¶¶ 1, 2; Exhibit B - Arrest Report by Jeremy Banks, CSD-000013.)

///

15-cv-1985-BEN(BLM)

III

STANDARD FOR SUMMARY JUDGMENT

A.    <u>Generally</u>.

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure on "all or any part" of a claim where there is an absence of a genuine issue of material fact, so that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P., 56; *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets its initial responsibility, the burden shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The opposing party may not rest upon the mere allegations or denials of their pleading. *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 959-60 (9th Cir 1994). To avoid summary judgment, the opposing party must demonstrate a genuine issue of material fact on all matters to which it has the burden of proof. *Lake Nacimiento Ranch Co. v. San Luis Obispo*, 841 F.2d 872, 876 (9th Cir. 1987). The opposing party must "produce evidence sufficient to support a jury verdict in her favor." *Gasaway*, 26 F.3d at 959. "As to materiality," the Supreme Court has held that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

B.    <u>Qualified Immunity</u>.

When seeking damages against an individual official, a 42 U.S.C. section 1983 plaintiff must show, "first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct." *Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015) (per curiam) (internal quotation marks omitted). A court may decide for itself which step of the analysis to

- 11 -

undertake first. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). A plaintiff who fails at either step cannot recover damages from an individual official. To determine whether a right was "clearly established" at the relevant time, the key question is whether the defendants should have known that their specific actions were unconstitutional given the specific facts under review. The "clearly established" inquiry cannot be conducted at too high a level of generality. See, e.g., *City & County of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775–76 (2015) ("We have repeatedly told courts -- and the Ninth Circuit in particular -- not to define clearly established law at a high level of generality."

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor,* 135 S. Ct. at 2044 (emphasis added) (quoting *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012)). Although a plaintiff need not find "a case directly on point, … existing precedent must have placed the … constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). A plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Taylor,* 135 S.Ct. at 2045. "The dispositive question is 'whether the violative nature of [the defendants'] particular conduct is clearly established.'" *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (per curiam). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (emphasis added) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam)). According to the Supreme Court, officials are entitled to qualified immunity so long as "none of our precedents 'squarely governs' the facts here," meaning that "we cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have . . . acted as [the officials] did." *Id.* at 310 (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

Qualified immunity is a question of law, not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). "Immunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

Only when "historical facts material to the qualified immunity determination are in dispute" should the district court submit the factual issue to a jury. *Torres*, 548 F.3d at 1211. If the only material dispute concerns what inferences properly may be drawn from the historical facts, a district court should decide the issue of qualified immunity. *Conner v. Heiman*, 672 F.3d 1126, 1131 n.2 (2012) ("[W]hile determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law."). Although a plaintiff need not find "a case directly on point, … existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). District court decisions -- unlike those from courts of appeals -- do not necessarily settle constitutional standards, or prevent repeated claims of qualified immunity. *Camreta v. Greene,* 563 U.S. 692, n. 7 (2011).

# IV

# APPLICABLE LEGAL PRINCIPLES

A.    <u>California Law Causes Of Action</u>.

Seven of the complaint's ten causes of action arise under California law: (1) Assault, (2) Battery, (3) False Arrest, (4) False imprisonment, (5) Violation of California Civil Code §§ 51.7 and 52.1, (9) Negligence, and (10) Intentional Infliction of Emotional Distress. Under California law, multiple pleaded causes of action arising from the same injury or harm are deemed a single cause of action pleaded under multiple theories.

> We explained in *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681: "[A] 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: *the violation of a single primary right gives rise to but a single cause of action.* [Citation.]" (Italics added.) Although "the phrase 'causes of action' is often used indiscriminately ... to mean *counts* which state differently the same cause of action" (*Eichler Homes of San Mateo, Inc. v. Superior Court* (1961) 55 Cal.2d 845, 847), its more precise meaning "is the right to obtain redress for a harm suffered" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798). " 'Even where there are multiple legal theories upon which recovery might be predicated, *one injury gives rise to only one claim for relief.*' " (*Ibid.*, quoting *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795, italics added.)

1    *Hayes v. County of San Diego,* 57 Cal.4th 622, 630–31 (2013).

2         Plaintiff's seven pleaded California law causes of action boil down to two kinds of

3    harm: unlawful physical force and unlawful detention.

4               1.     Unlawful Physical Force -- California Law.

5         Under California law, mere threatening words are not actionable.  *Plotnik v.*

6    *Meihaus,* 208 Cal. App. 4th 1590, 1603–1604 (2012).  "It is the duty of a citizen to obey

7    the commands of a peace officer given in his line of duty. If the officer is exceeding his

8    authority, the recourse of the citizen is to the courts and not to open resistance."

9    *People v. Yuen,* 32 Cal. App. 2d 151, 161 (1939).

10        Whether physical force used by law enforcement is actionable is analyzed the same

11   way under California law as it would be under the Fourth Amendment:

12   > A state law battery claim is a counterpart to a federal claim of
13   > excessive use of force. In both, a plaintiff must prove that the peace officer's
     > use of force was unreasonable.  [Citation.]  "Claims that police officers used
14   > excessive force in the course of an arrest, investigatory stop or other
     > 'seizure' of a free citizen are analyzed under the reasonableness standard of
15   > the Fourth Amendment to the United States Constitution."  [Citation.]  The
     > question is whether a peace officer's actions were objectively reasonable
16   > based on the facts and circumstances confronting the peace officer.
     > [Citation.]  The test is " 'highly deferential to the police officer's need to
     > protect himself and others.' "  [Citation.]

17
     > "'The "reasonableness" of a particular use of force must be judged
18   > from the perspective of a reasonable officer on the scene, rather than with
     > the 20/20 vision of hindsight. [Citation.] [T]he question is whether the
19   > officers' actions are "objectively reasonable" in light of the facts and
     > circumstances confronting them, without regard to their underlying intent or
20   > motivation. [Citations.]' " [Citations.]  In calculating whether the amount of
     > force was excessive, a trier of fact must recognize that peace officers are
21   > often forced to make split-second judgments, in tense circumstances,
     > concerning the amount of force required.  [Citation.]

22

23   *Brown v. Ransweiler,* 171 Cal.App.4th 516, 527–28 (2009).  Even if a person is detained

24   or arrested without lawful justification, "there is no right to use force, reasonable or

25   otherwise, to resist an unlawful detention …."  *Evans v. City of Bakersfield,* 22

26   Cal.App.4th 321, 333 (1994).

27        The complaint alleges violation of California Civil Code § 51.7, which prohibits

28   violent acts that were substantially motivated by the defendant's perception of plaintiff's

race or color, and § 52.1, interference by threats, intimidation, or coercion with
enjoyment of legally-protected rights.  (Complaint [ECF 1], 18:10-20:1.)  However,
threats, intimidation and coercion routnely accompany lawful detentions and arrests.
Threats, intimidation or coercion involving a nonviolent consequence do not violate the
section.  *See Cabesuela v. Browning-Ferris Industries*, (1998) 68 Cal.App.4th 101, 111
(1998).  "[A] wrongful detention that is 'accompanied by the requisite threats,
intimidation, or coercion' -- 'coercion independent from the coercion inherent in the
wrongful detention itself' that is 'deliberate or spiteful' -- is a violation of the Bane Act."
*Bender v. County of Los Angeles*, 217 Cal.App.4th 968, 981, internal citations omitted
(2013).

        2.    Unlawful Detention -- California Law.

        "'[F]alse arrest' and 'false imprisonment' are not separate torts.  False arrest is but
one way of committing a false imprisonment, and they are distinguishable only in
terminology."  *Collins v. City and County of San Francisco,* 50 Cal.App.3d 671, 673
(1975).  "The existence of probable cause depends upon facts known by the arresting
officer at the time of the arrest."  *Hamilton v. City of San Diego,* 217 Cal.App.3d 838,
844, internal citations omitted (1990).  "If the facts that gave rise to the arrest are
undisputed, the issue of probable cause is a question of law for the trial court."  *Levin v.
United Air Lines, Inc.*, 158 Cal.App.4th 1002, 1018–1019, internal citations omitted
(2008).

        A detention that does not lead to an arrest is justified if the officer has articulable
suspicion that the detained person may be involved in criminal activity.  "Although the
line may at times be a fine one, there is a well-settled distinction in law between an arrest
and a detention.  A detention is a lesser intrusion upon a person's liberty requiring less
cause and consisting of briefly stopping a person for questioning or other limited
investigation."  *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 591, fn. 5 (1979).  "A
detention … has been said to occur 'if the suspect is not free to leave at will -- if he is
kept in the officer's presence by physical restraint, threat of force, or assertion of

authority.' " *Evans,* 22 Cal.App.4th at 330, internal citation omitted. "It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation." *In re Tony C.,* 21 Cal.3d 888, 892 (1978). "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." *People v. Souza,* 9 Cal.4th 224, 231 (1994).

B.    <u>Federal Claims</u>.

Three of complaint's ten causes of action arise under federal law: (6) 42 U.S.C. § 1983, (7) 42 U.S.C. § 1985, and (8) 42 U.S.C. § 1986. They boil down to the same two kinds of harm as the California law causes of action: unlawful physical force and unlawful detention.

1.    Unlawful Physical Force -- Federal Law.

Plaintiff's sixth cause of action alleges liability under 42 U.S.C. § 1983, which creates no substantive rights, but provides only a remedy when rights secured by federal law or the Constitution are deprived under color of state law. *Lugar v. Edmondson,* 457 U.S. 922, 924 (1982). All claims that police officers used excessive force in the course of seizing a person are properly analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 395 (1989). In assessing reasonableness, the court should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 … "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain,

1    and rapidly evolving—about the amount of force that is necessary in a particular

2    situation." *Id.* at 396–97.

3          "When an officer's particular use of force is based on a mistake of fact, we ask

4    whether a reasonable officer would have or *should* have accurately perceived that fact."

5    *Torres v. City of Madera*, 648 F.3d 1110, 1124 (9th Cir.2011) (citing *Jensen v. City of*

6    *Oxnard*, 145 F.3d 1078, 1086 (9th Cir.1998) (emphasis in original).  "[W]hether the

7    mistake was an *honest* one is not the concern, only whether it was a *reasonable* one."

8     *Id.* at 1127 (emphasis in original).  The "relative culpability" of the parties *i.e.*, which

9    party created the dangerous situation and which party is more innocent, may also be

10   considered in determining the reasonableness of the force used.  *Espinosa v. City & Cnty.*

11   *of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).

12         The complaint also alleges violation of 42 U.S.C. §§ 1985 and 1986.  A § 1985

13   "plaintiff must allege and support with the requisite factual specificity the following

14   elements: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the

15   equal protection of the laws; (3) the commission of an overt act in furtherance of that

16   conspiracy; (4) a resultant injury to person or property or a deprivation of any right or

17   privilege of citizens; and (5) defendant's actions were motivated by a racial or otherwise

18   class-based invidiously discriminatory animus."  *Griffin v. Breckenridge,* 403 U.S. 88,

19   102-03 (1971).   To survive summary judgment on a § 1985 claim, a plaintiff must

20   identify specific facts suggesting that there was a mutual understanding among the

21   conspirators to take actions directed towards an unconstitutional end.  *See, e.g., Haley v.*

22   *Dormire,* 845 F.2d 1488, 1490 (8th Cir. 1988).  Section 1986 provides a cause of action

23   against one who has failed to prevent a § 1985 conspiracy.  If the § 1985 claim fails, so

24   does the § 1986 claim.  *Trerice v. Pedersen,* 769 F.2d 1398, 1403 (9th Cir.1985).

25         The right to make an arrest carries with it the right to employ some level of force to

26   effect it.  *Graham,* 490 U.S. at 396.  A court must consider that the officer may be

27   reacting to a dynamic and evolving situation, requiring the officer to make split-second

28   decisions.  *Id.* at 396–97.  Accordingly, an officer need not have perfect judgment, nor

- 17 -

must he resort only to the least amount of force necessary to accomplish legitimate law

enforcement objectives.  Rather, a range of force may be reasonable under the

circumstances.  *See, e.g., Graham,* 490 U.S. at 396 ("Not every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates the Fourth

Amendment." (quotation marks and citation omitted)); *see also Forrester v. City of San*

*Diego,* 25 F.3d 804, 807–08 (9th Cir.1994) ("Police officers, however, are not required to

use the least intrusive degree of force possible. Rather ... the inquiry is whether the force

that was used to effect a particular seizure was reasonable, viewing the facts from the

perspective of a reasonable officer on the scene. Whether officers hypothetically could

have used less painful, less injurious, or more effective force in executing an arrest is

simply not the issue." (citations omitted)).  The Supreme Court reiterated that standard in

*Saucier v. Katz,* 533 U.S. 194, 204–07 (2001).

> 2.    Unlawful Detention -- Federal Law.

"'[T]he excessive force and false arrest factual inquiries are distinct.' "  *Velazquez*

*v. City of Long Beach,* 793 F.3d 1010, 1024 (9th Cir.2015).  Merely establishing an

unlawful arrest " 'does not establish an excessive force claim, and vice-versa.' "  *Id.*

A law enforcement officer may conduct a brief stop for investigatory purposes when the

officer has only "reasonable suspicion" to believe the stopped individual is engaged in

criminal activity.  *See Terry v. Ohio*, 392 U.S. 1, 23-27 (1968).  "Reasonable suspicion"

is "a particularized and objective basis for suspecting the particular person stopped of

criminal activity."  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).  It

requires only "a minimal level of objective justification."  *Illinois v. Wardlow*, 528 U.S.

119, 123 (2000).  Officers may draw on their own experience and specialized training to

make inferences from and deductions about the cumulative information available to the

officer that might otherwise elude an untrained person.  *Valdes-Vega*, 738 F.3d at 1078

(citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002).)

"There is no bright-line rule to determine when an investigatory stop becomes an

arrest."  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citing *United States*

*v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988).  The analysis depends on the "totality of the circumstances" and is "fact-specific." *Washington,* 98 F.3d at 1185.  *See also Lyall v. City of Los Angeles*, 807 F.3d 1178, 1193 n.13 (2015) (detention of plaintiffs for 30-45 minutes for field show-up did not transform detention from *Terry* stop into arrest requiring more demanding showing of probable cause).

### 3.     Entity Liability -- Federal Law.

Under federal law, the County of San Diego's liability is contingent on whether Myles was deprived of a Fourth Amendment right by Deputy Banks.  If not, "the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."  *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).  If plaintiff establishes a Fourth Amendment violation, the County can only be liable under federal law if Deputy Banks' actions implemented a closely-related official County policy or widespread custom.  The Supreme Court's rejection of *respondeat superior* liability in *Monell v. Department of Social Services,* 436 U.S. 658 (1978) effectively absolves municipal entities of § 1983 liability for employing a violator of federal rights unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690.  The official policy or custom must be the "moving force" of the violation -- there must be a "direct causal link" to "closely related" conduct, and the official policy or custom must have "actually caused" the violation.  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385-91 (1989).  Also, "municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986).

In *City of Canton,* 489 U.S. at 388, the Court addressed "whether a municipality's failure to train employees can ever be a basis for § 1983 liability."  It held "that the inadequacy of police training may serve as the basis for § 1983 liability only where the

- 19 -

failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and the policy was "the moving force [behind] the constitutional violation." *Id.* (internal quotation marks omitted). The Court emphasized that "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

In *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404-05 (1997), the Court explained that it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

In *Connick v. Thompson,* 563 U.S. 51, 61 (2011), the Supreme Court reiterated that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (quoting *Brown,* 520 U.S. at 410). The Court explained, "[a] less stringent standard of fault for a failure-to-train claim 'would result in de facto respondeat superior liability on municipalities.'" *Id.* (quoting *City of Canton,* 489 U.S. at 392).

Thus *Monell* liability requires first, a showing of "a deliberate choice to follow a course of action … from among various alternatives." *Pembaur,* 475 U.S. at 483. Second, where *Monell* liability is based on the municipality's failure to act, or to train its employees, there must be a showing of deliberate indifference: "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown,* 520 U.S. at 410. Third, there must be "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

A plaintiff cannot show a basis for *Monell* liability by simply identifying an injury-causing custom or policy attributable to the entity.  A plaintiff must also demonstrate that

the entity's custom or policy was adhered to with "deliberate indifference to the constitutional rights of its inhabitants." *City of Canton,* 489 U.S. at 392.  Policymakers must have been on notice: "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."  *Id*. at 396.  In *Farmer v. Brennan,* 511 U.S. 825 (1994), the Court added: "it would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective."  *Farmer,* 511 U.S. at 841.  Government entities, unlike individuals, do not have states of mind: "Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Id.*

Constitutional liability for faulty training focuses on the training program, not on whether an individual officer's training was faulty.

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. [Citations.]  It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make
>
> mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton,* 489 U.S. at 390–91.

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."

*///*

- 21 -

1 | *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996) *holding modified by Navarro v. Block,*

2 | 250 F.3d 729 (9th Cir.2001).

3 | > A pattern of similar constitutional violations by untrained employees
4 | > is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that
5 | > they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of
6 | > their action -- the 'deliberate indifference' -- necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular
7 | > respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

8 | *Connick,* 563 U.S. at 62. (internal citations omitted). *Connick* clarified the "narrow range

9 | of circumstances" in which "a pattern of similar violations might not be necessary to

10 | show deliberate indifference." *Id.* The *City of Canton* "single-incident liability"

11 | hypothetical assumes a *complete* lack of training: "The *Canton* hypothetical assumes that

12 | the armed police officers have no knowledge at all of the constitutional limits on the use

13 | of deadly force" and without training "utter[ly] lack [the] ability to cope with

14 | constitutional situations." *Id.* at 67.

15 |       C.    Limitations On Expert Opinions.

16 |       Defendants anticipate that plaintiff may oppose this motion with opinions of hired

17 | experts. Federal Rule of Evidence 702(c) requires expert opinion testimony to be the

18 | product of reliable principles and methods. "The focus, of course, must be solely on

19 | principles and methodology, not on the conclusions they generate." *Daubert v. Merrell*

20 | *Dow Pharms., Inc.,* 509 U.S. 579, 595 (1993). The reliability of a proposed expert's

21 | testimony "entails a preliminary assessment of whether the reasoning or methodology

22 | underlying the testimony is scientifically valid and whether that reasoning or

23 | methodology properly can be applied to the facts in issue." *Id.* at 592-93. Among the

24 | inquiries is whether there is "general acceptance" of the methodology or theory. *Id.* at

25 | 593-94. To warrant admissibility, "it is critical that an expert's analysis be reliable at

26 | every step." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.

27 | 2002). "The fact that an expert disagrees with an officer's actions does not render the

28 | officer's actions unreasonable." *Reynolds v. Cty. of San Diego,* 84 F.3d 1162, 1170 (9th

- 22 -

Cir. 1996), *overruled on other grounds by Acri v. Varian Associates, Inc.,* 114 F.3d 999, 1001 (9th Cir. 1997) (summary judgment affirmed in excessive force case).

V

ARGUMENT

A.    Deputy Banks' Use Of Force Was Lawful And Objectively Reasonable.

Courts assessing reasonableness of force look at three factors: (1) "the type and amount of force inflicted," (2) "the government's interest in the use of force," and (3) the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Glenn v. Washington Cty.,* 673 F.3d 864, 871 (9th Cir.2011) (internal citations omitted). Those three factors are satisfied here. The types and amounts of force were proportional to the governmental interest in detaining vehicle burglary suspects. "[B]urglary and attempted burglary are considered to carry an inherent risk of violence." *Sandoval v. Las Vegas Metro. Police Dep't,* 756 F.3d 1154, 1163 (9th Cir.2014). Deputy Banks (1) tried to grab Myles from behind to force him down; (2) gave his K-9 the apprehension command; and (3) struck Myles' face with his hand. Banks' actions were proportional to the suspected offense.

Until recently, Ninth Circuit authority provided that: "in evaluating the severity of the intrusion on a plaintiff's Fourth Amendment rights, we must assess not only the *amount* of force used (and the severity of the resulting injury), but also *type* of force used and the *potential* harm it may cause." *Lowry v. City of San Diego,* 818 F.3d 840, 848 (9th Cir. 2016) (emphasis in original), *reh'g en banc granted,* No. 13-56141, 2016 WL 4932643 (9th Cir. Sept. 16, 2016). The *Lowry* plaintiff was an office worker who drank five vodkas and tried to sleep it off after hours, triggering the office burglar alarm. Responding officers, getting no response to their verbal warnings, sent a K-9 into the office, which bit the plaintiff's face. The K-9 officer said that the K-9 could have ripped the plaintiff's face off. The panel majority held that the force was "severe" and unconstitutional. *En banc* review has been granted, so *Lowry* is not citable as precedent. ///

- 23 -

The defense expert on police issues in this case, Curtis J. Cope, declares that Deputy Banks' actions comported with POST[2] and departmental training, and were reasonable. Cope's declaration and supplemental declaration detail his qualifications, opinions, and factual foundations for those opinions. (Exhibit D - Expert Witness Declaration of Curtis J. Cope; Exhibit E - Expert Witness Supplemental Declaration of Curtis J. Cope.) This is a case in which the force was proportional and justified by the governmental interest in detaining vehicle burglary suspects.

B.    Myles' Detention, Though Not Initiated By Deputy Banks, Was Justified By Reasonable Suspicion.

The Complaint frames the incident *solely* in racial terms -- allegedly Myles was detained *solely* because he was a black man driving through a white neighborhood. (Complaint [ECF 1], 1:3-8.) But even plaintiff's own police expert (Noble) testified that the stop and detention comported with accepted police practices -- which would not be so if Myles had been racially profiled and mistreated solely due to his race. (Exhibit F - Deposition of Jeffrey J. Noble, 29:10-43:21.) In this respect, the opposing experts agree that deputies had reasonable suspicion to detain Myles. (Exhibit D - Expert Witness Declaration of Curtis J. Cope, page 7.) Deputy Banks is entitled to summary judgment as to the detention.

C.    Alternatively, The County Of San Diego Is Not Liable Under Federal Law.

The Complaint does not allege a separate claim for *Monell*-type liability. A *Monell* plaintiff must show that implementation of an official policy or widespread custom "closely related" to a constitutional deprivation "actually caused" that deprivation. *City of Canton,* 489 U.S. at 385-91. The County, through its own high-level *deliberate* conduct, must have been the "moving force" behind the constitutional injury. *Bryan County,* 520 U.S. at 404-05. There is no basis for such liability in this case, because Deputy Banks exercised reasonable discretion in conformity with his training, and was not implementing any policy or custom.

---

[2] California Commission on Peace Officer Standards and Training.

15-cv-1985-BEN(BLM)

D.    <u>Alternatively, Deputy Banks Is Entitled To Qualified Immunity From Liability Under Federal Law</u>.

Under the facts of this case, it is not beyond debate that a reasonably competent officer in Deputy Banks' position would have acted as he did.  Thus he is entitled to qualified immunity, which  protects "all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

VI

CONCLUSION

Plaintiff Mickail Myles and his brother Elisic Sauls were stopped at the same time, at the same place, by the same deputies, for the same reason.  Both were ordered to drop to their knees, and both were handcuffed.  Similarities end there.  Sauls was released unharmed; he has not sued.  Plaintiff Myles was bitten by a K-9 and struck in the face.  Why the difference?

Sauls followed deputies' instructions.  Myles did not.  A scientist might say that Myles and Sauls were the only variables in the equation.  They responded differently to the same lawful instructions.  This Court may consider Myles' "relative culpability" in creating the dangerous situation in determining reasonableness of the force used. *Espinosa*, 598 F.3d at 537.

For the foregoing reasons, defendants respectfully request summary judgment or, alternatively, partial summary judgment on unlawful force, unlawful detention, County liability under federal law, and qualified immunity for Deputy Banks.

DATED: October 31, 2016         THOMAS E. MONTGOMERY, County Counsel

By: s/ MORRIS G. HILL, Senior Deputy
Attorneys for Defendants County of San Diego
(also sued as "San Diego County Sheriff's
Department") and Jeremy Banks
E-mail: morris.hill@sdcounty.ca.gov

- 25 -