UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MICKAIL MYLES,

                              Plaintiff,

v.

COUNTY OF SAN DIEGO, by and
through the SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT, a public
entity; and DEPUTY J. BANKS, an
individual,

                              Defendants.

Case No.:  15-cv-1985-BEN (BLM)

**ORDER:**

**(1) GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT; and**

**(2) DENYING DEFENDANTS'
MOTION FOR SEPARATE TRIALS**

   Plaintiff Mickail Myles has brought a civil rights action related to an incident
between Plaintiff and San Diego County Sheriff's Deputy Jeremy Banks in which Banks
used force on Plaintiff.  Presently before the Court are two motions brought by
Defendants the County of San Diego (the "County") and Deputy Jeremy Banks ("Deputy
Banks" or "Banks"):  (1) Defendants' Motion for Summary Judgment or, Alternatively,

Partial Summary Judgment (MSJ, ECF No. 55); and (2) Defendants' Motion for Separate Trials as to County Federal Liability and as to Individual Punitive Damages (Mot. to Bifurcate, ECF No. 56). Plaintiff opposes both motions (Opp'n to MSJ, ECF No. 66; Opp'n to Mot. to Bifurcate, ECF No. 77), and Defendants have filed replies in support of their motions (Reply to MSJ, ECF No. 72; Reply to Mot. to Bifurcate, ECF No. 78). After briefing closed, Defendants submitted two letters regarding new authority for the Court's consideration. (Ltrs., ECF Nos. 96, 98). Plaintiff responded to both letters. (Resps. to Ltrs., ECF Nos. 97, 99).

The Court has considered the parties' arguments and the law. For the reasons discussed below, the Court grants in part and denies in part Defendants' motion for summary judgment and denies Defendants' motion for separate trials.

## BACKGROUND

### I. Factual Background[1]

#### A. The Police Receive a Vehicle Burglary Report and Stop Plaintiff's Car

Around fifteen minutes before midnight on September 5, 2014, Fallbrook, California resident Charles Sommer called 911 and reported that four young Hispanic men had been trying to break into a vehicle a block from his home. (CD Recording & Tr. of 911 Call, Defs.' Ex. A ("Defs.' Ex. A"); Decl. of Hanan Harb ¶ 1). Two of the four left the scene in a white sedan. (Defs.' Ex. A). A Sheriff's radio dispatcher reported an attempted vehicle break-in and that "there were two subjects that were running and got into a white sedan, unknown DOT out of the neighborhood." (CD Recording & Tr. of Radio Dispatch Event E1930789, Defs.' Ex. C ("Defs.' Ex. C"); Decl. of Hanan Harb ¶ 2). The dispatcher did not announce the suspects' race. (Defs.' Ex. C). A few minutes

---

[1] The Court's reference to certain pieces of evidence is not an indication that this is the only pertinent evidence relied on or considered by the Court. The Court has reviewed and considered all the evidence submitted by the parties. To the extent not otherwise stated and not inconsistent with this Order, Defendants' evidentiary objections are overruled.

later, the dispatcher reported that individuals in the same neighborhood were ringing doorbells and running away. (*Id.*) The dispatcher stated that the doorbell report may be related to the vehicle report. (*Id.*)

Defendant Sheriff's Deputy Jeremy Banks and several other deputies responded to the radio call. (Decl. of J. Banks ¶ 2 (incorporating his arrest report, Defendants' Exhibit B, as part of his declaration); Banks's Arrest Report, Defs.' Ex. B ("Defs.' Ex. B")). As Banks took Charles Sommer's statement, a white sedan drove past, and bystanders identified it as the suspect vehicle. (*Id.*) Banks observed two males of an unknown race seated in the driver's and front passenger's seats. (*Id.*) Plaintiff Mickail Myles sat in the driver's seat and his brother, Elisic Sauls, sat in the passenger's seat. (*Id.*) Myles and Sauls are African American. (*Id.*)

The deputies stopped the vehicle. (*Id.*) Banks could not see how many suspects were in the vehicle, as it had darkly tinted rear windows, and decided to get his K9 partner, Bubo, to assist in the apprehension. (*Id.*)

**B. The Police Order Plaintiff Out of the Car and Into Police Custody**

One of the deputies on the scene, Deputy Allison, ordered Plaintiff to step out of the car. (Defs.' Ex. B; Dep. of Deputy Shane Allison, Pl.'s Ex. 10 ("Pl.'s Ex. 10")). Myles complied with that command. (Defs.' Ex. B.)

What happened next is disputed. In general, the parties agree that Myles walked backwards from his car to the rear of the patrol car parked behind his vehicle. They agree that Bubo barked throughout the encounter. The parties also agree that once Myles reached the rear of the patrol car, Banks and Bubo made physical contact with Myles. But the sequence of events and whether Myles complied with the officers' commands is at issue.

The parties present the following testimony to the Court:

*(i)* ***Plaintiff Mickail Myles:*** Myles testified that he stepped out of his car and put his hands in the air. He heard multiple, different commands from the officers, such as "get on the ground" and "put your hands in the air." He also heard the dog barking.

Myles was facing away from the officers.  As the officers' commands were not consistent, he looked over his shoulder to tell the officers he could not hear and that he did not know what they wanted him to do.  The officers told him to turn around and walk backwards towards the patrol car, which Myles did.  Myles never lowered his hands, which had been in the air since he exited his vehicle, and never stopped walking backwards.  He did not hear any commands while he completed the backwards walk. Once he reached the rear of the patrol car, the officers grabbed Myles, turned him towards the trunk of the car, and then handcuffed him.  As he was handcuffed, the officers read Myles his *Miranda* rights.  Only two to five seconds passed from the time he was touched by an officer to the handcuffs being around his wrists.

After Myles was handcuffed, he twice asked the officers what was happening. Hearing no response, he looked over his shoulder and was hit behind his left ear with something made of metal and then bit by the canine on his left torso.  Myles next felt the handcuffs tighten around his wrists and multiple officers holding him.  (*See* Dep. of Mickail Myles, Pl.'s Ex. 21 ("Pl.'s Ex. 21")).

*(ii)* ***Defendant Deputy Jeremy Banks:***  Banks testified that when he arrived at the scene, Deputy Allison was giving commands to Myles.  Myles was facing the officers.  Allison ordered Myles to put his hands in the air and turn around.  Myles was slow to comply and said he could not hear.  Banks then started giving commands, ordering Myles to face away from the officers and put his hands in the air.  Myles complied.

Banks gave Myles a canine announcement, warning him that he must follow Banks's orders or else the dog will bite him.  Banks did not ask whether Myles heard the warning.  Banks ordered Myles to walk backwards towards the officers.  Myles walked backwards but, at some point, he turned around, put his hands down, and started walking towards the officers.  Banks responded to Myles by ordering him to stop, face away from the officers, and put his hands in the air.  Myles complied.  Banks again ordered Myles to

/ / /

walk backwards towards his voice. Myles complied, walking backwards to Deputy Allison's car trunk.

When Myles was three to five feet away from Banks, Banks ordered Myles to get on his knees, but Myles did not comply and kept walking backwards. Banks gave the order two to three times. Allison also gave the command, and Myles did not comply. No one asked whether Myles heard the commands. Banks then grabbed Myles by the back of his neck and started to push his head down to the ground. Myles ducked away from Banks's grasp and walked out of his view. Banks feared Myles was going to attack him from behind. Banks then gave Bubo the apprehension command, and Bubo bit Myles on his left torso, released, and bit Myles's shirt.

Deputy Allison and Deputy Brumfield grabbed Myles's left and right arms, respectively, and pushed him against the trunk of Allison's vehicle. In that position, Myles was bent over with his head and torso lying on top of the trunk. Myles resisted Allison and Brumfield's grasp. Banks then used his right fist to strike Myles twice on the left side of his face and ordered him to stop resisting. Myles stopped resisting, and Brumfield and Allison handcuffed Myles and placed him in the rear seat of Allison's patrol vehicle. (*See* Defs.' Ex. B; Dep. of Deputy Jeremy Banks, Pl.'s Ex. 7 ("Pl.'s Ex. 7") & Defs.' Ex. G ("Defs.' Ex. G")).

In addition to the parties' testimony, witnesses on the scene offer varying accounts of the events. The witness testimony is consistent with parts of Plaintiff's and Defendant's versions in some respects, but different in others:

*(i) **Michael Dorsett:*** Dorsett observed Myles exit the vehicle and walk backwards in compliance with the officers' commands. Myles never put his hands down. Dorsett heard the officers' command for Myles to get down on his knees, but noted that the barking dog was closer to Myles. The first physical contact between the officers and Myles was when the officers pushed Myles over the trunk of the patrol car. Myles wiggled and squirmed, but Dorsett did not believe Myles resisted the officers. Dorsett did not see Banks grab or attempt to grab Myles's neck and did not see Myles duck and

spin away from Banks.  Dorsett did not recall the dog biting Myles and his excerpted deposition testimony does not include any mention of Banks's strikes to Myles.  (*See* Dep. of Michael Dorsett, Pl.'s Ex. 11 ("Pl.'s Ex. 11")).

    *(ii)* **Deputy Shane Allison:**  Deputy Allison testified that shortly after Myles exited the vehicle, Myles announced that he could not hear.  Allison ordered Myles to face away from the officers, and Myles complied.  Allison ordered Myles to put his arms in the air, with which Myles complied.  Myles then turned to face the officers and Allison told him again to turn around and face away.  Myles complied.  Allison gave commands until Banks took over.

    When Myles was near the rear of the patrol car, Banks ordered Myles to get on his knees.  Myles did not comply.  Next, Allison and Banks ordered Myles to get on his knees, but Myles did not comply.  No one asked Myles whether he heard the command.  Myles did not make any efforts to flee the scene, and Allison did not observe any weapons on Myles.  Allison testified that, once Myles was near the patrol car's trunk, the only indication of noncompliance from Myles was his failure to comply with the command to kneel.  However, later in Allison's deposition, he testified that Banks attempted to grab Myles by the neck, and Myles ducked out of the way.

    Allison testified that he was the first person to touch Myles.  He grabbed Myles on his left wrist.  Allison stated that "once I put my hand on [Myles], actions he took made me put him into a rear wrist lock."  Pl.'s Ex. 10 at 158.  While Allison attempted to gain control of Myles's left arm, Deputy Brumfield approached and "gained control" of Myles's right arm.  *Id.* at 159.  At this point, Myles was bent over the trunk.  "[A]fter [Myles's] hands were behind his back by [Allison] and Deputy Brumfield," Allison "saw the K-9 attempt to make contact with [Myles]."  *Id.* at 160.  Banks hit Myles at least once while Allison and Brumfield held Myles.  Allison is "almost a hundred percent certain" that Myles was not handcuffed when Banks struck him.  *Id.* at 162.

/ / /

/ / /

Once the officers had Myles in custody, Allison asked Myles why he did not get on his knees. Myles replied, "Because I couldn't hear you. All three of you were yelling." *Id.* at 137. (*See generally* Pl.'s Ex. 10).

     *(iii)   Deputy Andrew Brumfield:* Brumfield testified that Myles walked toward the rear of the patrol car without any physical altercation. Brumfield admitted that his arrest report does not document any noncompliance by Myles, with the exception of Myles's slow compliance with exiting his vehicle. Brumfield also testified that when Banks struck Myles, Deputy Allison was "trying to control [Myles's] left hand" and that Allison was "struggling to get [Myles's left hand] behind his back." (*See* Dep. of Deputy Andrew Brumfield at p. 91, Pl.'s Ex. 8 ("Pl.'s Ex. 8")).

     *(iv)   Deputy Ronald Bushnell*: Bushnell testified that Myles turned around at least twice while he was walking backwards to the patrol car. He did not observe Myles drop his hands towards his waistband or reach down for anything. He admitted that his arrest report does not document any noncompliance from Myles. (*See* Dep. of Deputy Ronald Bushnell, Pl.'s Ex. 9 ("Pl.'s Ex. 9")).

### C. The Police Clear the Car and Arrange a Lineup of Plaintiff and Sauls

     With Myles in custody, Banks completed the procedures to order Sauls out of the passenger side of the white sedan. (Defs.' Ex. B). After Sauls was handcuffed and placed in Deputy Brumfield's patrol vehicle, Banks and Bubo cleared the car, which contained no one else. (*Id.*) North County Fire Department officers treated Myles's puncture wounds and scrapes caused by Bubo's teeth. (*Id.*) Myles did not need transport to the hospital by ambulance. (*Id.*)

     The officers arranged a lineup of Myles and Sauls, but a witness stated that they did not match any of the suspects. (*Id.*) The officers released Sauls, but Banks arrested Myles for violation of California Penal Code section 148(a)(1) for obstructing a peace officer. (*Id.*)

/ / /

/ / /

### D. The Police Interview Plaintiff at Fallbrook Hospital

Deputies Brumfield and Bushnell transported Myles to Fallbrook Hospital. (Defs.' Ex. B). Once there, Banks read Myles his *Miranda* rights and interviewed him. (CD Recording & Tr. of Myles Interview by Dep. Banks, Defs.' Ex. I ("Defs.' Ex. I")). Banks asked Myles if he could hear Banks's commands. (*Id.*) Myles replied, "Yes and no." (*Id.*) Myles explained that he heard the commands "open your door," "put your hands up," and "step back." (*Id.*) Banks asked, "When you got closer, did you hear me tell you to get on your knees?" (*Id.*) Myles responded, "I did, but – ." (*Id.*) Myles did not complete his thought. Banks asked, "Is there any reason why you chose not to [get on your knees]?" (*Id.*) Myles stated, "No reason. I was probably just scared." (*Id.*)

Banks next asked, "Is there any . . . reason why you pulled away from me when I put my hands on you?" (*Id.*) Myles responded, "I don't really remember." (*Id.*) At the end of the brief interview, Banks asked, "[D]id you hear me give canine announcements that you were going to be bit if you didn't do as I told you?" (*Id.*) Myles answered, "Sir, it was – it was kind of a blur, so – ." (*Id.*) Myles did not provide a more definitive answer.

Following Banks's interview, Sergeant Brian Hout of the Sheriff's Canine Unit interviewed Myles about the use of Bubo on Myles. (CD Recording & Tr. of Myles Interview by Sgt. Hout, Defs.' Ex. J ("Defs.' Ex. J")). Hout asked, "Did you hear the warning that the dog would be sent or an order to comply?" (*Id.*) Myles responded, "Sir, it was all a blur." (*Id.*) Myles added, "I mean, you know, they told me to get out of the car, back up. And there was a lot of them at once, you know, yelling or whatever. I saw the dog, but I don't know." (*Id.*) Hout next asked, "And is there a reason why you didn't comply with the specific commands?" (*Id.*) Myles answered, "Sir, I didn't hear." (*Id.*) Hout also asked how long the dog was biting Myles, and he responded that the bite lasted "[p]robably a couple of seconds." (*Id.*)

The County declined to prosecute Myles for a violation of section 148. (Pl.'s Ex. 7).

## II. Procedural History

Plaintiff filed his complaint on September 4, 2015 against the County of San Diego and Deputy Banks. (Compl., ECF No. 1). Plaintiff brings claims for (1) assault, (2) battery, (3) false arrest, (4) false imprisonment, (5) violation of California Civil Code § 51.7 and § 52.1, (6) violation of 42 U.S.C. § 1983, (7) violation of 43 U.S.C. § 1985, (8) violation of 42 U.S.C. § 1986, (9) negligence, and (10) intentional infliction of emotional distress. Every claim is alleged against the County and Deputy Banks.

## MOTION FOR SUMMARY JUDGMENT

## I. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a summary judgment motion, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255.

A moving party bears the initial burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It can do so by negating an essential element of the non-moving party's case, or by showing that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the party will bear the burden of proof at trial. *Id.* The burden then shifts to the non-moving party to show that there is a genuine issue for trial. *Id.* As a general rule, the "mere existence of a scintilla of evidence" will be insufficient to raise a genuine issue of material fact. *Anderson*, 477 U.S. at 252. There must be evidence on which the jury could reasonably find for the non-moving party. *Id.*

/ / /

## II. Discussion

Defendants move for summary judgment on all claims or, alternatively, partial summary judgment on the issues of unlawful detention, unlawful force, qualified immunity for Deputy Banks, and the County's federal liability. They contend that all seven state law claims and the three federal claims concern two issues: unlawful detention and unlawful physical force. Defendants frame their motion in terms of these two issues without addressing the actual elements of each claim or which claims are affected by which issue. Plaintiff structures his response accordingly, addressing the detention, force, qualified immunity, and entity liability issues raised by Defendants. Both parties analyze the detention and force issues under the Fourth Amendment. The Court addresses each issue in turn.

### A. Detention

Defendants seek summary judgment on the issue of Myles's detention. In their motion, it appears they limit their argument to whether the deputies had reasonable suspicion to stop Myles. Plaintiff does not appear to contest that the deputies had reasonable suspicion to stop him. Instead, Myles contends that the detention became unlawful when Deputy Banks continued to detain him after witnesses confirmed he was not involved in the incident and chose to arrest him for a violation of California Penal Code section 148.

Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of his person. U.S. Const. amend. IV. A seizure of a person for a brief investigatory stop is reasonable if, under all the circumstances known to the officers at the time, the officer had reasonable suspicion that the person stopped is, is about to be, or was engaged in criminal activity, and the length and scope of the stop was reasonable. *See United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1, 19-27 (1968). Reasonable suspicion is based on the totality of the circumstances and is a particularized and objective basis for suspecting the particular person stopped of criminal activity. *Cortez*, 449 U.S. at 417-18.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that no genuine issues of material fact exist and Defendants are entitled to summary judgment on any claims related to the decision to stop Myles. It is undisputed that Charles Sommer called 911 to report a suspected vehicle burglary involving two teens that left the scene in a white sedan. (Defs.' Ex. A). When the white sedan containing Plaintiff and his brother drove past the scene, bystanders identified the car as the one involved in the suspected vehicle burglary. (Defs.' Ex. B). Based on this witness identification that conformed with the initial 911 call, the Sheriff's deputies had reasonable suspicion to believe that the occupants of the white sedan were engaged in criminal activity. Therefore, their decision to stop the car to investigate was reasonable. To the extent any of Plaintiff's claims are premised on the unlawfulness of the initial investigatory stop, the Court grants summary judgment in Defendants' favor on those claims.

However, genuine issues of material fact preclude summary judgment on Deputy Banks's decision to arrest Myles for a violation of California Penal Code section 148(a)(1) once the officers confirmed that Myles was not among the suspects engaged in the reported vehicle burglary.[2] To be a lawful arrest, Deputy Banks had to have probable cause to arrest Myles for a violation of California Penal Code section 148(a)(1). *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 37 (citations omitted). Probable cause to arrest for a section 148(a)(1) violation requires a reasonable officer to believe that (1) the criminal defendant willfully resisted,

_____

[2] Because it appears that Defendants only seek summary judgment on the decision to stop Plaintiff, the Court notes that summary judgment would be inappropriate on issues that Defendants fail to raise. To avoid confusion, the Court considers Plaintiff's argument about his continued detention and arrest.

15-cv-1985-BEN (BLM)

delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her lawful duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her lawful duties. *See* Cal. Penal Code § 148(a)(1); *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018-19 (9th Cir. 2015).

Ninth Circuit and California law give citizens "considerable latitude" in challenging police without such conduct violating section 148. *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995). Verbal challenges to police and slow compliance with police orders do not violate section 148. *See Velazquez*, 793 F.3d at 1022-23 (reversing district court's grant of judgment as a matter of law on plaintiff's unlawful arrest claim where plaintiff was detained for asking officer "what's up" and then arrested under section 148 despite plaintiff's evidence that he never resisted orders from officer); *Mackinney*, 69 F.3d at 1006-07 (holding that neither plaintiff's "refus[al] to comply for a matter of seconds" with "order [] to stop writing on the sidewalk" with sidewalk chalk nor plaintiff's "refus[al] to agree to stop writing" on the sidewalk violated section 148); *People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993) ("It is true that [appellant] complied slowly with Officer Stefani's orders, but it surely cannot be supposed that Penal Code 148 criminalizes a person's failure to respond with alacrity to police orders."). In contrast, a suspect's refusal to comply with lawful orders, rather than his slow compliance, or his affirmative act in direct disobedience of repeated police orders is sufficient for section 148 liability. *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169-70 (9th Cir. 2011) (upholding lawfulness of section 148 arrest where plaintiff refused to obey officer's order to reenter his vehicle); *Navarro v. Sterkel*, No. 5:11-cv-01700-LHK, 2012 WL 3249487, at *7 (N.D. Cal. Aug. 7, 2012) (finding that officer had probable cause to arrest plaintiff for violation of section 148 where plaintiff failed to pull over after seeing the officer's lights and removed his hands from the steering wheel despite the officer's orders for plaintiff to keep his hands on the wheel).

///

Here, the parties present three possible incidents that could give a reasonable officer probable cause to arrest for a section 148 violation: (1) Plaintiff's compliance with the orders to walk backwards from his car to the patrol vehicle; (2) Deputy Banks's alleged neck grab and Plaintiff's evasion of his grasp; and (3) the events that occurred as Plaintiff was bent over the trunk of the patrol car. Viewing the evidence in Plaintiff's favor, none of these incidents create probable cause for a section 148 arrest.

As to Plaintiff's backwards walk from his car to the patrol vehicle, he testified that he complied with all of the orders he heard. (*See* Pl.'s Ex. 21). Plaintiff's testimony is supported by the testimony of Michael Dorsett and Deputy Brumfield, who observed Myles walk backwards to the patrol car in compliance with the officers' orders. (*See* Pl.'s Exs. 8, 11). While Dorsett and some of the police officers testified that Banks and Allison commanded Myles to get on his knees, Myles testified that he only heard this command when he first stepped out of his vehicle. (*See* Pl.'s Ex. 21). He said that he never heard that command once he reached the rear of the patrol car. (*Id.*) Plaintiff's in-custody statement to Deputy Allison that he "couldn't hear" the command to get on his knees supports this deposition testimony. (Pl.'s Ex. 10 at 137). There is a genuine dispute about whether Plaintiff heard and complied with the orders. If Plaintiff did not hear the orders, he could not willfully resist those orders. *See* Cal. Penal Code § 7 (explaining that "willfully" means "a purpose or willingness to commit the act").

Defendants ascribe significant weight to Plaintiff's post-arrest statement to Deputy Banks while in Fallbrook Hospital. When asked whether Plaintiff "hear[d] [Banks] tell [him] to get on [his knees]" once he "got closer," Plaintiff replied that he "did, but --." (Defs.' Ex. I). Defendants contend this statement is an admission from Myles that he heard the order. The Court is not persuaded. At this stage, the Court does not weigh evidence or resolve issues of credibility. In the face of the contrary evidence discussed above, such a short, incomplete sentence is insufficient to take the issue away from the jury. A jury could give more weight to Plaintiff's contemporaneous statement to Deputy

/ / /

Allison than to his later statement to Deputy Banks. Triable issues exist whether Myles complied with the officers' commands.

As to the second circumstance that could create probable cause, the record is entirely unclear whether Banks grabbed, or attempted to grab, Myles's neck, causing Myles to duck out of Banks's grasp. Deputy Banks contends the neck grab and duck occurred, but according to Plaintiff's and Michael Dorsett's versions of events, it did not. This difference alone is sufficient to find a genuine issue of material fact. Going further, a reasonable jury could discredit Deputy Allison's testimony and find that the deposition testimony of Deputies Brumfield and Bushnell tends to corroborate Plaintiff's account. When Deputy Allison first recounted the events, he made no mention of the neck grab. Allison only corrected his testimony at the end of his deposition. The most Bushnell and Brumfield could say regarding Myles's noncompliance was that he was slow to exit his vehicle, that Myles turned around at least twice while walking backwards to the patrol car, and that Deputy Allison had difficulty getting Myles's left hand behind his back. (*See* Pl.'s Ex. 8 & 9). Their testimony does not mention the purported neck grab and evasion.

The final possible event that might create probable cause for a section 148 arrest is what occurred while Plaintiff was bent over the trunk of the patrol vehicle. According to Plaintiff, he allowed the officers to handcuff him, asked what was happening, and then was hit by something and bit by the dog. (Pl.'s Ex. 21) His deposition testimony does not shed any light on whether he moved or "resisted" the handcuffing. Witness Michael Dorsett testified that Plaintiff wiggled and squirmed when the officers placed their hands on him, but Dorsett refused to characterize Plaintiff's movements as resistance. (*See* Pl.'s Ex. 11). Deputies Banks, Allison, and Brumfield testified that there was some struggle between the officers. Whether Myles was combative during the handcuffing, and exactly when the handcuffing occurred in connection with the use of force, are triable issues of fact. A reasonable jury could credit Plaintiff's and Dorsett's testimonies and find that Plaintiff's actions did not rise to the level of willful resistance, delay, or obstruction.

Construing the facts and all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that Deputy Banks did not have probable cause to arrest Plaintiff for willfully resisting, delaying, or obstructing the officers' exercise of their lawful duties. Thus, Defendants are not entitled to summary judgment on this aspect of Plaintiff's unlawful detention claims.

**B. Use of Force**

Plaintiff contends that Deputy Banks employed excessive force on him three times: (1) when Banks grabbed Plaintiff's neck and tried to force him to the ground, (2) when Banks ordered Bubo to bite Plaintiff, and (3) when Banks hit Plaintiff. Defendants argue that Banks's "actions were proportional to the suspected offense" of vehicle burglary. (Opp'n at 23).

Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures using the framework articulated in *Graham v. Connor*, 490 U.S. 194, 201 (2001). The relevant question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "This determination requires [the Court] to balance the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Shafer v. Padilla*, No. 15-56548, slip op. at 9 (9th Cir. Aug. 29, 2017) (citing *Graham*, 490 U.S. at 396).

**1. Nature and Quality of the Intrusion**

The Court first must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017). Each case must be evaluated on its own facts. *Id.*

In this case, the parties dispute whether Deputy Banks grabbed Plaintiff's neck but agree that Myles was bitten by the dog and hit in the face or head in some manner. Triable issues of fact exist regarding whether the neck grab even occurred. How a jury

resolves this issue might impact its analysis of whether Banks used excessive force in punching Plaintiff and ordering Bubo to bite him.

With respect to the dog bite, Ninth Circuit "precedent establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances." *Lowry*, 858 F.3d at 1256. Here, it is undisputed that Bubo bit and released Plaintiff. Bubo did not drag Plaintiff over the ground. While the dog did puncture Plaintiff's skin, he did not shred Plaintiff's muscles. Plaintiff was treated at the scene and did not require emergency transport to the hospital. In this case, "the risk of harm posed by this particular use of force, and the actual harm caused, was moderate." *Id.* at 1257. Nevertheless, a jury might still find it excessive in light of the need for the use of force.

As to the head or face strike, Plaintiff contends he was hit in the back of the head with something metal, possibly a baton. Defendants argue that Banks punched Plaintiff with a closed fist on the side of the face. The Court need not resolve how and where Myles was hit, as either use of force may be considered a significant use of force. "A police officer's use of baton blows . . . presents a significant use of force that is capable of causing pain and bodily injury, and therefore, baton blows . . . are considered a form of 'intermediate force.'" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011). Closed fist punches, while generally less dangerous than baton strikes, are still capable of inflicting serious bodily injury. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (concluding that the officer's punches "were not reasonably justified" because there was no "need for any use of force" under plaintiff's version of events); *Lopez v. City of Imperial*, No. 13-CV-00597-BAS WVG, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015). The head or face strikes are "a sufficiently serious intrusion" upon Plaintiff's liberty interests to require the justification "by a commensurately serious state interest." *Young*, 655 F.3d 1162-63.

/ / /

/ / /

15-cv-1985-BEN (BLM)

## 2. Governmental Interest in the Use of Force

Next, the Court must evaluate the government's interest in the use of force. That interest is assessed by considering three, non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. *Graham*, 490 U.S. at 396. "Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citing *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

There is a genuine issue of material fact whether Deputy Banks used force on Plaintiff before or after he was under police control. Given this dispute, the Court must credit Plaintiff's version of events and draw all reasonable inferences in his favor. According to Plaintiff, he was handcuffed and being held by two officers over the trunk of a vehicle when he was hit and bitten. At that point, the officers suspected him of vehicle burglary and had not yet patted him down. Vehicle burglars might have tools on them for use in the burglary that could be used as weapons. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) ("Burglary and attempted burglary are considered to carry an inherent risk of violence."). But this threat was not immediate. Plaintiff's hands were immobilized in handcuffs and his upper body was being held against the trunk of the patrol vehicle by two officers. Plaintiff never attempted to flee or strike any of the officers or the canine. Viewing the facts in favor of Plaintiff, there was little to no need to use any force.

## 3. Balancing the Competing Interests

The final step of the excessive force inquiry requires the Court to balance the gravity of the intrusion on Plaintiff's Fourth Amendment rights against the government's need for that intrusion. *Lowry*, 858 F.3d at 1260. Here, a reasonable jury could conclude that, in light of the degree of danger Plaintiff posed once handcuffed, the degree of force used was excessive. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

1052, 1059 (9th Cir. 2003) ("[A]fter [plaintiff] was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted."); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012) (concluding that summary judgment on excessive force claim was not warranted where officers used force on plaintiff after he was handcuffed and face down on a bed); *Ross v. City of Toppenish*, 104 F. App'x 28, 28-29 (9th Cir. 2004) (finding triable issues of fact whether officers' actions after plaintiff was handcuffed constituted excessive force). A trier of act could find that Deputy Banks violated Plaintiff's Fourth Amendment right against excessive force.

Therefore, the Court denies Defendants summary judgment on the issue of excessive force.

## C. Qualified Immunity

Deputy Banks seeks qualified immunity from liability under federal law. He contends that "it is not beyond debate that a reasonably competent officer in Deputy Banks'[s] position would have acted as he did." (Opp'n at 25). Plaintiff objects to granting Deputy Banks qualified immunity. He contends that qualified immunity is not appropriate because triable issues of fact remain regarding Banks's use of force and arrest of Plaintiff following the field line-up.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether an officer is entitled to qualified immunity, the court considers (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016). Both prongs must be present for the officer to be liable; otherwise, he is entitled to immunity.

/ / /

Here, the Court has already determined that, taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Banks violated Myles's Fourth Amendment rights to be free from unlawful arrest and from the use of excessive force. Thus, the only question remaining is whether the Fourth Amendment rights at issue were clearly established at the time of the violation. The relevant inquiry is "whether the state of the law at the time of the official conduct complained of was such as to give the defendant[] 'fair warning' that [his] conduct was unconstitutional." *Young*, 655 F.3d at 1167 (internal citation omitted). The Court must continue to the view the disputed facts in favor of Plaintiff. *Blankenhorn*, 485 F.3d at 477 (where parties dispute material facts, "summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party").

As to the section 148 arrest, it was well-settled by the time of the incident that a section 148 violation requires an affirmative act of disobedience or resistance. *Young*, 655 F.3d at 1170. Under Plaintiff's version of events, the decision to arrest him for a section 148 violation is clearly unreasonable. Plaintiff complied with all of the officers' orders that he heard. He did not physically resist Banks or the other officers. A reasonable officer could not believe that probable cause existed to arrest Plaintiff for a violation of section 148 under such circumstances. *Cf. Mackinney*, 69 F.3d at 1006 (denying qualified immunity because "[n]o reasonable officer could have thought that complying with a police order slowly could be a violation of § 148").

Similarly, the Court declines to grant qualified immunity to Deputy Banks on the excessive force issue. Existing law at the time of the incident recognized a Fourth Amendment violation where police officers used force against a handcuffed, compliant individual who poses no serious safety threat. *See Drummond*, 343 F.3d at 1061-62 (denying qualified immunity); *Tucker*, 470 F. App'x at 629 (denying qualified immunity based on *Drummond*, even though plaintiff "continued to resist the officers after handcuffs were applied"); *Ross*, 104 F. App'x at 29 (denying qualified immunity).

/ / /

Accordingly, viewing the facts in favor of Plaintiff, Deputy Banks is not entitled to qualified immunity for his arrest of and use of force on Plaintiff.

**D. County of San Diego's Federal Liability**

Plaintiff's complaint alleges three federal claims against the County of San Diego: a claim for violation of 42 U.S.C. § 1983, a claim for violation of 42 U.S.C. § 1985(2) and (3), and a claim for violation of 42 U.S.C. § 1986. Both the County's argument in its motion, and Plaintiff's argument in opposition, address the County's liability under section 1983 pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The Court addresses *Monell* liability first.

**1. *Monell* Liability**

Municipalities, like the County of San Diego, can be held directly liable for constitutional violations under 42 U.S.C. § 1983, but they "cannot be held liable . . . on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A local government entity cannot be liable under 42 U.S.C. § 1983 unless a policy, custom, or practice of the entity is shown to be the moving force behind the constitutional violation. *Id.* at 694.

Plaintiff advances several theories of *Monell* liability. Those theories are (1) that the County has a pattern and practice of ignoring and failing to investigate officers accused or suspected of excessive use of force, (2) that the County's use of force policy fails to provide deputies with direction regarding how to make use of force decisions, and (3) that the County has failed to train, monitor, and supervise its employees, such that its failure constitutes deliberate indifference to citizens' lives. The Court finds that there is insufficient evidence of a policy, pattern, or practice to support any of Plaintiff's *Monell* theories.

**a. Pattern and Practice Claim**

Plaintiff argues that the County has a pattern and practice of ignoring use of force incidents and failing to investigate those incidents properly. (Opp'n at 19-24). The County of San Diego may be liable under 42 U.S.C. § 1983 for "a longstanding practice

15-cv-1985-BEN (BLM)

or custom which constitutes the standard operating procedure." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). The practice or "custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled . . . policy.'" *Id.* (citing *Monell*, 436 U.S. at 691). "A custom or practice can be inferred from . . . evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Velazquez*, 793 F.3d at 1027 (internal citation omitted). "Evidence of 'identical incidents' to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions, while general evidence of departmental treatment of complaints and of the use of force can support the plaintiff's theory that . . . disciplinary and complaint processes contributed to the police excesses complained of because the procedures made clear to the officer that . . . he could get away with anything." *Id.* (internal citations omitted). If the plaintiff can prove a custom or practice, he or she still must prove that the custom or practice was the cause of the constitutional deprivation. *Trevino*, 99 F.3d at 918.

Notwithstanding evidentiary issues regarding the admissibility of some of Plaintiff's evidence, none of his proffered evidence demonstrates a pattern or practice of ignoring and failing to properly investigate uses of force. Plaintiff supports his pattern and practice claim by pointing to how the Myles incident was investigated as well as seven other use of force incidents, some of which involved Deputy Banks. But there is no evidence that these incidents required a certain type of investigation that the Sheriff's Department failed to complete. Nor is there any evidence that the alleged inadequacy of the use of force investigations led to a violation of Plaintiff's rights. The Court briefly discusses the Plaintiff's evidence below.

Plaintiff first contends that the Sheriff's Department's internal investigation of the Myles matter was inadequate. Plaintiff's expert Jeffrey Noble declares that the Sheriff's Department "did not conduct any inquiry into the serve [sic] use of force by its deputies in the Myles matter other than to conduct a K9 review by the K9 sergeant. Neither an Internal Affairs investigation, nor a Use of Force investigation were conducted. There is

15-cv-1985-BEN (BLM)

no evidence that . . . the department conducted a meaningful internal investigation even though Mr. Myles was grabbed by the neck, punched on the head and bitten by a police dog, receiving injuries that required medical attention." (Decl. of J. Noble ¶ 27). Plaintiff asserts that an Internal Affairs ("IA") investigation was required, citing to deposition testimony from Lieutenant Jeffrey Duckworth and Sergeant James Pucillo, designated as Persons Most Knowledgeable in the Sheriff's Department.

Plaintiff's position is not supported by the record. To start, Plaintiff glosses over the County's procedures for opening use of force investigations. He does not submit any documents evidencing an administrative complaint to the Sheriff's Department, nor does he explain why an investigation was warranted in this case. While Plaintiff complains that the Sheriff's Department only performed a K9 review, his own evidence belies that assertion. The Sheriff's Department conducted a claims investigation at the command level. (*See* Dep. of Robert Kanaski, Pl.'s Ex. 37 ("Pl.'s Ex. 37"); Dep. of James Pucillo, Pl.'s Ex. 40 ("Pl.'s Ex. 40")). A claims investigation is one type of investigation that the Sheriff's Department may conduct. (Pl.'s Exs. 37, 40; Dep. of Jeffrey Duckworth, Vol. II, Pl.'s Ex. 17 ("Pl.'s Ex. 17")). But Plaintiff provides no evidence that a different type of investigation was required.

On that point, Plaintiff miscites deposition testimony from Lieutenant Duckworth and Sergeant Pucillo for the proposition that an IA investigation should have been conducted. But neither Duckworth nor Pucillo made that statement. Lieutenant Duckworth answered a hypothetical question (Dep. of Jeffrey Duckworth, Vol. I, Pl.'s Ex. 39 at 57 ("Pl.'s Ex. 39")). And the citation to the Pucillo answer lacks the question asked and is thus incomplete and unreliable. (Pl.'s Ex. 40 at 45).

/ / /

/ / /

/ / /

/ / /

/ / /

In addition to the Myles matter, Plaintiff presents evidence from five use of force incidents involving Banks and two involving other officers, all of which allegedly involved inadequate internal investigations.[3] The first incident occurred in May 2013. Banks detained a Hispanic juvenile for jaywalking and kicked him in the chest. The juvenile filed a citizens' complaint, to which the Sheriff's Department IA Unit responded, stating that it "conducted a preliminary investigation," "found the matter described does not rise to the level of misconduct by Sheriff's personnel," and that "no formal investigation will be opened at this time." (May 2013 Incident Compl. and Resp., Pl.'s Ex. 14 ("Pl.'s Ex. 14")). Lieutenant Duckworth testified that an IA investigation was not required. (Pl.'s Ex. 17). He explained that the receipt of a citizen complaint does not mean that the IA Unit always opens an investigation. *Id.*

The second incident happened in June 2013, during which four officers, including Deputy Banks, struck, tased, and deployed Banks's canine on a 36-year-old Hispanic man, Hugo Barragan, after he had fled the scene of a traffic stop and ran into his home. Barragan died at the scene. Plaintiff complains that IA did not conduct an investigation of his matter. But, Plaintiff ignores his own evidence that the Homicide Unit conducted a complete investigation, interviewing every officer at the scene, as is the procedure when someone dies while in custody. (*See* Barragan Documents, Pl.'s Ex. 16 ("Pl.'s Ex. 16"); Dep. of Yancey Mayordeleon, Vol. II, Pl.'s Ex. 44 ("Pl.'s Ex. 44")).

The third incident involved Banks tasing, striking, and attempting a neck control hold on a Hispanic juvenile runaway. Plaintiff cites to a YouTube video and television

---

[3] Plaintiff discusses the five Banks incidents in his Statement of Additional Facts in Dispute. In his Notice of Lodgment, he includes evidence of a sixth incident involving Deputy Banks from 2014, during which Banks deployed his canine partner Bubo to apprehend a suspect. (*See* Canine Deployment Report, Pl.'s Ex. 20). Plaintiff does not develop or discuss any facts regarding this incident. Given that, the Court does not discuss the incident, but it has considered the exhibit and finds that it does not support Plaintiff's pattern and practice claim.

15-cv-1985-BEN (BLM)

news website to explain the facts of the case and argue that "there is no evidence that the use of force was ever actually investigated." (Pl.'s Add'l Facts in Dispute ¶ 148). These websites are not evidence that the incident was not investigated. Nor are they evidence that the County has a pattern of ignoring use of force incidents. Furthermore, in deposition testimony, Plaintiff's attorney appears to concede that no citizen complaint was filed regarding this incident. *See* Pl.'s Ex. 17.

The fourth incident occurred in September 2015. Banks and another officer used force on a Hispanic man who had fled from his vehicle after a traffic stop. The other officer had a canine partner that he used on the suspect. Plaintiff presents no evidence that a citizen's complaint was filed, that an investigation was required, or that an investigation occurred but was inadequate.

The fifth incident happened in October 2016 between Banks and Erin Valdez, during which Banks allegedly handcuffed Valdez and forced her arms behind her back to extract a confession. Plaintiff relies on a videotaped, sworn statement by Valdez. (Tr. of Statement of Erin Valdez, Pl.'s Ex. 49 ("Pl.'s Ex. 49")). Valdez's statement was not made in the presence of defense counsel and was taken after the discovery cutoff. Plaintiff also submits a letter to the IA Unit that Valdez allegedly wrote, complaining about the incident. (Ltr. from Erin Valdez, Pl.'s Ex. 50 ("Pl.'s Ex. 50")). Both the recorded statement and letter are hearsay. *See* Fed. R. Evid. 801 (defining hearsay as an out of court statement offered to prove the truth of the matter asserted in the statement). Plaintiff has no evidence that the letter was mailed to the Sheriff's Department. In fact, his counsel declares that the County claims to have never received the letter. (Decl. of J. Dicks ¶ 7). Plaintiff has no evidence that the County received Valdez's complaint and chose to ignore it.

Finally, Plaintiff identifies two other incidents, not involving Banks, that purportedly demonstrate the Sheriff's Department's failure to investigate uses of force. One incident occurred in January 2013 and involved Officer Ertz's alleged punches and five-second application of a carotid restraint hold. (*See* Complaint 2013-C-239, Pl.'s Ex.

47 ("Pl.'s Ex. 47")). The second incident concerned Deputy Jeffrey Guy, who allegedly unlawfully detained, pepper-sprayed, and beat a young Hispanic pedestrian with Down's Syndrome. (*See* Press Article, Pl.'s Ex. 48 ("Pl.'s Ex. 48")). Plaintiff's only evidence is the victim's complaint in the Ertz case and a newspaper article regarding a settlement in the Guy case. (Pl.'s Exs. 47, 48). Neither the complaint nor the newspaper article are evidence of whether the Sheriff's Department conducted a proper investigation.

Plaintiff tries to develop an argument that Sheriff's deputies do not adequately document use of force and that the Sheriff's Department tolerates this alleged inadequacy. Thus, it appears that part of Plaintiff's theory is that "departmental treatment of . . . the use of force . . . contributed to the police excesses complained of because the procedures made clear to the officer that . . . he could get away with anything." *Velazquez*, 793 F.3d at 1027. Use of force supplement forms and canine reports usually must be completed when an officer uses force or deploys a canine. Pl.'s Ex. 17. Plaintiff contends that some of these required forms are missing entirely or are missing information.

But the failure to complete these forms is not evidence of a pattern or practice of ignoring use of force incidents. Indeed, there is evidence that the Sheriff's Department has procedures in place to ensure that the forms are completed properly. Lieutenant Duckworth explained that when a form is missing, IA inquires with the command. *Id.* The Department samples ten percent of the use of force reports completed each month to ensure the forms are completed properly. Pl.'s Ex. 37. If an error is found, the form is sent back to the appropriate party to complete. *Id.* These procedures do not "ma[k]e clear" that officers can "get away" with failing to document use of force. *Velazquez*, 793 F.3d at 1027. There is no evidence that missing or incomplete forms "contributed to" Banks's alleged misconduct. *Id.* Plaintiff's evidence is insufficient to establish a pattern or practice of ignoring and failing to investigate officers' use of force.

/ / /

/ / /

### b. Use of Force Policy

Plaintiff argues that the San Diego "Sheriff's Department's use of force policy fails to provide deputies with direction regarding how to make use of force decisions, and as such, further supports a *Monell* claim against the County." (Opp'n at 23). Under the *Monell* doctrine, Plaintiff may recover if the policy "causes" the constitutional violation. *Lowry*, 858 F.3d at 1255 (citing *Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994)).

Plaintiff has not included the County's written use of force policy in its opposition papers. However, one does exist, as Plaintiff's expert reviewed it and opines on it: "The San Diego County Sheriff's Department use of force policy offers no guidance on the K9 as a use of force implement. . . . Instead, the policy refers to the department K9 manual. . . . The San Diego County Sheriff's Department use of force policy and K9 manual do not provide any direction on when the use of a K9 would be appropriate. Absent any direction on when to use a force implement that is considered a severe use of force . . . renders the Sheriff's Department use of force policy unreasonable." (Prelim. Expert Rpt. of Jeffrey J. Noble, Pl.'s Ex. 4 at 51 ("Pl.'s Ex. 4"); *see also* Decl. of J. Noble ¶ 19 (stating same opinion)). Although Plaintiff contends that the County's policy fails to provide guidance on how to use any type of force, Plaintiff's expert's opinion is limited to the use of canine force.

Summary judgment on this particular *Monell* theory is appropriate for at least two reasons. First, other than Noble's opinion about the use of canine force, Plaintiff offers no other evidence that the County's policy fails to provide guidance as to other types of force. Absent the actual policy, the Court cannot determine what guidance the policy does or does not provide to its officers and, accordingly, whether Deputy Banks followed that guidance. As such, there is no evidence that the County's use of force policy caused the alleged constitutional violation.

Second, Noble's opinion that the policy does "not provide any direction" on when to use a canine is contradicted by his own statement. In his report, Noble admits that the County's K9 manual states that a canine may be used "[f]or the protection of the handler,

other law enforcement officers and citizens; to locate, apprehend or control a felony suspect when it would be unsafe for the deputies to proceed into the area; to locate, apprehend or control armed misdemeanor suspects; to search for narcotics; for crowd control; for the protection of detention deputies during prisoner movement; article searches." (Pl.'s Ex. 4 at 51). Thus, the policy does provide guidance. Plaintiff fails to explain how this guidance is insufficient and how the policy, as written, caused the alleged violation.

### c. Failure to Train and Supervise

Plaintiff's final *Monell* theory is that "municipal liability may also be based on constitutional violations resulting from its failure to supervise, monitor or train its employees, where its failure amounts to 'deliberate indifference' to the rights of the people with whom the local government comes into contact." (Opp'n at 23-24). He contends that the "County had actual knowledge of a long series of misconduct by Deputy Banks and failed to take reasonable steps to investigate and address the numerous allegations against him." (Opp'n at 24).

Under *Monell*, a municipality may be liable under § 1983 for policies of inaction, such as a failure to train and supervise. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."); *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (considering allegations of failure to supervise). In inaction cases, the plaintiff alleges that the government body has failed to "implement procedural safeguards to prevent constitutional violations." *Id.* (internal citations omitted). To prove such a policy, Plaintiff must first show that the municipality's failure "amount[s] to deliberate indifference to the rights of persons with whom the untrained [or unsupervised] officers come into contact." *Connick*, 563 U.S. at 61 (internal citations omitted). This requires showing that the County was "on actual or constructive notice that a particular omission . . . causes . . . employees to violate citizens' constitutional rights" and instead

of fixing the issue, disregarded the problem. *Id.* "Only then can such a shortcoming be properly thought of as a [municipal] policy or custom that is actionable under § 1983." *Id.* (internal citations and quotation marks omitted). Second, Plaintiff must show that the policy caused his constitutional injury in the sense that his injury could have been avoided had the County trained and supervised Deputy Banks. *See Jackson*, 749 F.3d at 763.

In support of his claim, it appears that Plaintiff relies on the use of force incidents involving Deputy Banks and other officers that the Court outlined above. But Plaintiff's evidence does not create a genuine issue of material fact as to whether the County deliberately chose not to train and supervise its employees. The mere existence of these other incidents does not reflect a pattern of similar constitutional violations. Not only are those incidents not similar, *see Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."), but there is no evidence that those incidents amounted to constitutional violations. There is no evidence of any failure to train or supervise, nor any evidence that the County made a deliberate choice to avoid adequate training and supervision. Viewing the evidence in a light most favorable to Plaintiff, no reasonable jury could find that the County was deliberately indifferent to the need to train and supervise its deputies.

In conclusion, the County is entitled to summary judgment on all three theories of Plaintiff's *Monell* claim under 42 U.S.C. § 1983.

### 2. County's Liability under 42 U.S.C. §§ 1985 and 1986

Plaintiff's complaint alleges violations of 42 U.S.C. § 1985(2), § 1985(3), and § 1986. Section 1985(2) applies to conspiracies to obstruct justice,[4] section 1985(3) applies

---

[4] 42 U.S.C. § 1985(2) states: "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely,

to conspiracies to deprive a person of any right or privilege,[5] and section 1986 applies to the failure to prevent conspiracies to obstruct justice or deprive someone of "equal protection of the laws, or of equal privileges and immunities under the laws."[6]  A section

---

fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

[5] 42 U.S.C. § 1985(3) states:  "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

[6] 42 U.S.C. § 1986 states:  "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful

1985 claim requires the existence of a conspiracy, and a successful section 1986 claim is predicated upon a violation of section 1985. 42 U.S.C. §§ 1985, 1986; *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1024 (9th Cir. 2001).

Defendants state, in conclusory fashion, that they move for summary judgment on these claims, but they do not present any argument regarding why summary judgment is warranted. Although the Court cannot discern any evidence of a conspiracy, it is reluctant to grant summary judgment on claims that Defendants do not fairly raise for response by Plaintiff. Accordingly, the Court denies summary judgment on Plaintiff's section 1985 and 1986 claims without prejudice. However, as explained further below, the Court provides notice that it is considering entering summary judgment on these claims pursuant to Federal Rule of Civil Procedure 56(f) and gives Plaintiff an opportunity to respond.

## III. Conclusion

Triable issues of fact exist as to whether Deputy Banks had probable cause to arrest Plaintiff for a section 148 violation and whether he used excessive force in detaining Plaintiff. But there are no genuine issues of fact on the reasonableness of the decision to stop Plaintiff's car and whether the County had a policy, pattern, or practice of ignoring use of force incidents, failing to provide deputies with direction in how to use force, and failing to supervise and train deputies.

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's claims for assault, battery, false arrest, false imprisonment (to the extent the

---

neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

claim is premised on Plaintiff's arrest), and violation of Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983 as to Defendant Deputy Banks (to the extent the claim is premised on the lack of probable cause to support the arrest and the use of excessive force). The Court also denies Deputy Banks qualified immunity.

The Court grants Deputy Banks summary judgment on the false imprisonment and 42 U.S.C. § 1983 claim insofar as those claims are based on the reasonableness of the car stop. The Court also grants the County summary judgment on the 42 U.S.C. § 1983 *Monell* claim. Because Plaintiff's claim of negligence is based on *Monell* liability, *see* Compl. ¶ 90 ("Defendants breached their duty to Plaintiff by failing to properly screen, hire, retain, supervise, report, discipline, monitor, control, terminate, or prosecute (when justified) its law enforcement officers, including the individual Defendants herein."), the Court also grants Defendants summary judgment on the negligence claim.

That leaves Plaintiff's fifth claim for violation of California Civil Code §§ 51.7 and 52.1, his seventh claim for violation of 42 U.S.C. §§ 1985(2) and 1985(3), his eighth claim for violation of 42 U.S.C. § 1986, and his tenth claim for intentional infliction of emotional distress. The Court will briefly address these four claims.

Plaintiff's fifth claim alleges that a "motivating reason for Defendants threatening violence was their perception of Plaintiff's race and color as a member of a minority group." (Compl. ¶ 64). California Civil Code § 51.7 "declares that all persons have the right to be free from violence or intimidation because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because they are perceived by another to have any of these characteristics." *Venegas v. Cnty. of Los Angeles*, 32 Cal. 4th 820, 841-42 (2004). California Civil Code § 52.1 provides a private right of action where a "person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual . . . of rights secured by the Constitution." Cal. Civ. Code § 52.1(a), (b).

Plaintiff's seventh claim alleges that Defendants "engaged in the obstruction of justice, conspired to obstruct justice, and conspired to effectuate the deprivation of Plaintiff's rights under the Fourth, Fifth, Sixth, and 14th Amendments of the U.S. Constitution." (Compl. ¶ 75). Plaintiff's eighth claim alleges that Defendants "having the power to prevent or to aid in preventing the commission of the acts more specifically set forth above, and having neglected and refused to take such means available and necessary to so prevent or aid in preventing said acts, have violated" 42 U.S.C. § 1986. (Compl. ¶ 82). As explained above, 42 U.S.C. §§ 1985 and 1986 claims require the existence of a conspiracy.

Plaintiff's tenth cause of action pleads a claim for intentional infliction of emotional distress. An intentional infliction of emotional distress claim requires Plaintiff to prove (1) extreme and outrageous conduct by Defendants with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) that Plaintiff suffered severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by Defendants' outrageous conduct. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009).

Federal Rule of Civil Procedure 56(f) provides that after giving notice and a reasonable time to respond, the Court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3); *Celotex*, 477 U.S. at 326 (noting district court's power to enter summary judgment sua sponte). The Court has reviewed all the evidence submitted in this case. Now, pursuant to Rule 56(f), the Court gives notice that it is considering entering summary judgment on the fifth, seventh, eighth, and tenth claims on the grounds that there is insufficient evidence to prove those claims. The Court notes the following deficiencies: (1) the Court sees no evidence that Defendants' conduct was motivated by "their perception of Plaintiff's race and color" such that Plaintiff can prevail on his fifth claim for violation of California Civil Code §§ 51.7 and 52.1, (2) the Court sees no evidence of a conspiracy to do any of the wrongs identified in 42 U.S.C. §§ 1985 and

15-cv-1985-BEN (BLM)

1986 such that Plaintiff can prevail on his seventh and eighth claims, and (3) the Court sees no evidence that Defendants acted with the intention of causing, or reckless disregard of the probability of causing, emotional distress and no evidence that Plaintiff suffered severe and extreme emotional distress such that Plaintiff can prevail on his tenth claim for intentional infliction of emotional distress.

Plaintiff may file additional briefing, not to exceed 15 pages, to address these issues no later than 21 days after the entry of this Order. Defendants may file a response, not to exceed 15 pages, no later than seven days after Plaintiff's filing. Thereafter, the Court will take the matter under submission.

## MOTION FOR SEPARATE TRIALS

Defendants seek to bifurcate trial. They ask the Court to conduct a separate trial on the issues of the County's federal liability and punitive damages against Deputy Banks. Defendants' concern arises from Plaintiff's anticipated introduction of evidence about other use of force incidents involving Deputy Banks, which this Court has discussed above. Defendants also believe that Plaintiff may try to characterize Deputy Banks as a sadist or racist.

The Court has broad discretion to bifurcate trial "for convenience, to avoid prejudice, or to expedite and economize" proceedings. Fed. R. Civ. P. 42(b); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004). In this case, the Court exercises its discretion and denies Defendants' motion. The Court has granted Defendants summary judgment on the 42 U.S.C. § 1983 claim against the County, and it has provided notice that it is considering granting summary judgment on the remaining federal claims against the County and on the state law claim alleging that racial basis motivated Deputy Banks's actions. Even if the Court ultimately does not enter summary judgment on those claims, appropriate limiting instructions can remedy Defendants' concerns.

/ / /

/ / /

15-cv-1985-BEN (BLM)

# CONCLUSION

The Court grants in part and denies in part Defendants' motion for summary judgment. (ECF No. 55). The Court denies Defendants' motion for separate trials. (ECF No. 56).

As explained above, the Court notifies Plaintiff that it is considering entering summary judgment on Plaintiff's fifth, seventh, eighth, and tenth claims for relief. Should Plaintiff seek to respond, it may file a brief consistent with the time and page limits set forth above. Once the Court has considered these additional issues, it will set a new date and time for a pretrial conference.

**IT IS SO ORDERED.**

Dated: September 20, 2017

Hon. Roger T. Benitez
United States District Judge